**In re Lewis J. HECKER, Debtor.**

**No. 99–34954–BKC–SHF.**

United States Bankruptcy Court,
S.D. Florida,
West Palm Beach Division.

Oct. 13, 2004.

David L. Rosendorf, Kozyak, Troopin & Throckmorton, P.A., Miami, FL, for Kokomo Spring Co., Inc.

Jordan Rappaport, Kenneth Rappaport, P.A., Boca Raton, FL, for Debtor.

John Walsh, Dzikowski & Walsh, Ft. Lauderdale, FL, for Patricia Dzikowksi, Chapter 7 Trustee.

*ORDER SUSTAINING KOKOMO SPRING COMPANY INC.'S OBJECTIONS TO CLAIMED EXEMPTION FOR STONEBRIDGE PROPERTY AND COUNTRY CLUB MEMBERSHIP AND DISALLOWING CLAIMED EXEMPTIONS*

STEVEN H. FRIEDMAN, Bankruptcy Judge.

THIS CAUSE came on to be heard on June 7 and June 8, 2004, upon the objection of creditor Kokomo Spring Company Inc. ("Kokomo") to the claim of exemptions by the Debtor, Lewis J. Hecker ("Hecker") for the real property located at 10582 Stonebridge Boulevard, Boca Raton, Flori-

da owned by Hecker and his wife Gloria Hecker (the "Stonebridge Property") and Hecker's Equity Membership at the Stonebridge Golf & County Club ("Membership"). For the reasons that follow, which constitute the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52, as incorporated by Fed. R.Bankr.P. 7052 and 9014, the Court finds and concludes that Hecker is not entitled to claim the Stonebridge Property or the Membership as exempt, and accordingly Kokomo's objections to the claimed exemptions is sustained.

## PROCEDURAL BACKGROUND

On October 8, 1999, Hecker filed his voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (CP # 1). In his bankruptcy schedules, Hecker listed among his assets the Stonebridge Property, with a stated value of $360,000 (Hecker. Ex. 2, CP # 7). Hecker claimed the Stonebridge Property as exempt pursuant to Art. 10, § 4 of the Florida Constitution (Hecker Ex. 2). On December 10, 1999, Kokomo timely filed its Memorandum of Objection to Claim of Exemption, pursuant to 11 U.S.C. § 522(1) and Fed.R.Bankr.P. 4003(b), including, *inter alia*, the claimed exemption for the Stonebridge Property and the Membership (Hecker Ex. 3; CP # 18). With respect to the Stonebridge Property, Kokomo contended that Hecker had obtained money from Kokomo through fraud, and that the purchase of the Stonebridge Property was funded with fraudulently obtained and transferred proceeds.

As to the claimed exemption for the Membership at Stonebridge Golf & Country Club, Hecker's counsel explained at the hearing that "We do not believe that there is any Florida law which specifically ex-

empts 'golf memberships.' ... It's our position that the golf membership is an indistinguishable unseparable [inseparable] part [of the homestead]. But if it is separable, there's no exemption." (June 7, 2004 Hearing Transcript, p. 94–95). This Order deals only with the claimed exemption for the Stonebridge Property and the Membership, and in particular Hecker's claim that the Membership is inseparable from the homestead property. Certain other scheduled assets which Hecker has claimed as exempt, and which are encompassed in Kokomo's objections to exemptions, have been addressed by separate order. More specifically, the Debtor's claimed exemption as to the Lewis J. Hecker Retirement Trust has been disallowed by separate order (CP # 173). Kokomo's objections to claimed exemptions for the IRA Account and Pension Contract were withdrawn prior to hearing.

On December 22, 2003, this Court entered an Order on Status Conference which set the objections to exemptions for an evidentiary hearing (CP # 139). In accordance with that Order, the parties submitted a Pretrial Order (CP # 169) identifying certain stipulated and disputed facts and issues of law. The evidentiary hearing with respect to the Stonebridge Property and the Membership was conducted on June 7 and 8, 2004. At the hearing, Kokomo introduced into evidence excerpts of Hecker's testimony from prior depositions and from a prior trial, and called Douglas Bailey, the former chief executive officer of Kokomo, to testify. Kokomo also moved into evidence Kokomo's trial exhibits 17, 24, excerpts of 25–29, 30–40, and excerpts of 42, all of which were admitted.

At the close of Kokomo's case, Hecker moved for a judgment on partial findings pursuant to Fed.R.Civ.P. 52, as incorporated by Fed.R.Bankr.P. 7052 and 9014, arguing that Kokomo had failed to meet its burden of defeating the claim of homestead exemption with respect to the Stonebridge Property. The Court denied the motion based on the evidence that had been presented by Kokomo at the hearing (June 7, 2004 Transcript, p. 99). Accordingly, Hecker proceeded to present his case, consisting of Hecker's testimony at trial and Hecker's Exhibits 1–3, 6, 13–14, 18, and 20. After the hearing, in accordance with procedures set by the Court, Hecker also identified certain cross-designations from Hecker's prior deposition and trial testimony.

## FINDINGS OF FACT

On July 9, 1987, Kokomo (then known as Spring Acquisition Company) closed on an agreement to acquire all of the stock of a business known as Kokomo Spring Company, Inc. from a company of which Hecker was the sole shareholder (June 8, 2004 Hearing Transcript, pgs. 64–65; Kokomo Ex. 39, 40). Hecker had engaged in a multitude of fraudulent misrepresentations and omissions in connection with the sale, and the debt owed by Hecker to Kokomo as a result of the transaction was determined by this Court to be one incurred through false pretenses, false representations or actual fraud and accordingly nondischargeable (Kokomo Ex. 39, 40).[1]

Kokomo provided approximately $4.3 million consideration in connection with the acquisition, including cash consider-

---

1. All of the findings and conclusions relating to the commission of a fraud in connection with the Kokomo transaction, made in the District Court action against Hecker, and this Court's Order Granting Summary Judgment on Kokomo's complaint to have its claim against Hecker determined to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A), have res judicata and/or collateral estoppel effect against Hecker in this proceeding.

ation at closing of approximately $1.05 million (the "Kokomo Fraud Proceeds") (June 8, 2004 Hearing Transcript, p. 67). The Kokomo Fraud Proceeds were initially deposited as follows: $723,000 (specifically, $723,431.79) was deposited into an account of Kokomo Holding Company ("KHC"), a company owned and controlled by Hecker, at Connecticut National Bank (Acct. No. 0106002443); and $330,000 was deposited into an account of Lewis Hecker and his then-wife Miriam Hecker at Connecticut National Bank (Acct. No. 050422676) (June 8, 2004 Hearing Transcript, pp. 67–68; Kokomo Ex. 25, p. 50; Kokomo Ex. 35).

Over the ensuing months subsequent to the July 9, 1987 deposit of proceeds from the Kokomo sale, Kokomo began to discover a number of problems in connection with the sale. Kokomo sent a letter to Hecker addressing some of those issues on September 4, 1987, and held a meeting with him on September 8, 1987 (June 8, 2004 Hearing Transcript, p. 72). Shortly after that meeting, Hecker moved the Kokomo Fraud Proceeds to newly opened bank accounts at Chemical Bank in New York: on September 18, 1987, Hecker opened new accounts at Chemical Bank for himself and his wife (Acct. No. 967–267765) and for KHC (Acct. Nos. 967–042550 and 967–085780), and on September 21, 1987 transfers of $1,600,000 (to Hecker) and $330,000 (to KHC) were made from the Connecticut National Bank accounts of KHC and Hecker to the newly opened Chemical Bank accounts (Kokomo Ex. 35, 36).

By Hecker's own testimony, the funds moved from Connecticut National Bank to Chemical Bank included the Kokomo Fraud Proceeds. His own testimony establishes that at the time the transfers were made, a substantial portion of the Kokomo Fraud Proceeds remained in the Connecticut National Bank accounts, and that the funds deposited to Chemical Bank represented the net proceeds from the Kokomo transaction:

Q. So on July 9, 1987, checks totaling approximately $1 million were delivered to you?

A. Right.

\* \* \* \* \* \*

Q. What happened to the $700,000?

A. Well, $200,000 I know went to the broker. And legal and accounting fees, I'm not sure how many they were, but probably another $100,000 by the time I finished, so that was $400,000. There were taxes that I had to pay.

Q. That you or the corporation?

A. The corporation had to pay. I paid myself some salary I think of about $15,000 or $20,000. So it gets down to around $300,000, $350,000, which is about where it is.

\* \* \* \* \* \*

Q. And the net result is the contents of the Chemical Bank account in New York City?

A. Yes. It is around—yes, what is in Chemical Bank in New York City.

\* \* \* \* \* \*

Q. Now, you personally received approximately $300,000 in cash at the closing.

A. Right.

Q. What was the disposition of that money?

A. Well, I lived on it, because the payments from Kokomo stopped almost immediately after the closing, so I used that money to live on. I had taxes of over $100,000 of $20,000, (sic.) or whatever, and it in the bank accounts.

Q. And those—

A. I am living on them.

Q. The bank accounts down in Florida?

A. Yes, Florida. And I am living on that money.

(Kokomo Ex. 25, pp. 51–54). Accordingly, of the funds which were deposited into the accounts at Chemical Bank, at least $500,000 constituted the Kokomo Fraud Proceeds ($300,000 to $350,000 left from the $723,000 paid to KHC, and approximately $200,000 left of the $330,000 paid to Hecker).[2]

After September 1987, Kokomo continued to discover additional problems with the Kokomo transaction, including the discovery that Hecker had caused Kokomo Spring Company to give a guarantee of a promissory note on which approximately one million dollars was owed, and which had not been disclosed in connection with the sale (June 8, 2004 Hearing Transcript, pp. 72–73). Kokomo filed suit against Hecker on March 3, 1988 (June 8, 2004 Hearing Transcript, p. 73). Upon filing suit, Kokomo sought a prejudgment attachment of Hecker's assets, and after doing so learned that he had transferred his Connecticut house to his wife on November 25, 1987, the day after another meeting to discuss Kokomo's claims (June 8, 2004 Hearing Transcript, p. 73).

The District Court ordered Hecker to appear for a deposition regarding his assets, which did not occur until May 20, 1988 (June 8, 2004 Hearing Transcript, pp. 74–75). Although he did not testify to it in May 1988,[3] Hecker later acknowledged that in April 1988, after he had been ordered to appear for the asset deposition, Hecker formed a new company called H.D.G. Investments Corp. ("HDG"), that he owned all the shares of HDG and was its president, that he opened a bank account for HDG at Citizens and Southern Bank (subsequently known as Nations-Bank), and that between April 12 and 20, 1988, he transferred a total of $1,000,000 from the Chemical Bank accounts to HDG, plus $425,000 to a company owned by his wife called Ingram Corp., plus $100,000 into newly opened personal accounts at Citizens and Southern Bank (Kokomo Ex. 29, pp. 2059–2062).

Hecker's own testimony confirms that he did not have any source of income other than the Kokomo Fraud Proceeds after the sale of Kokomo and before the transfer into the Chemical Bank accounts. When he was deposed in May 1988, Hecker testified that he had no other assets other than bank accounts (Kokomo Ex. 25, pp. 20–22). Hecker further testified that he had no source of income other than interest on his bank accounts, and was not owed any salary, commissions, bonuses, consulting payments, management fees, directors' fees,

---

2. The account statements of the Connecticut National Bank accounts confirm that the transfers to Chemical Bank constituted substantially all the funds in those accounts at the time, and that the Kokomo Fraud Proceeds deposited to Connecticut National bank were not depleted before the transfers to Chemical Bank in September 1987 (Kokomo Ex. 35, 36). In any event, as discussed below, there is a legal presumption that Hecker spent his own money from these accounts before he spent the Kokomo Fraud Proceeds, so that the funds transferred to Chemical Bank are presumed to contain the Kokomo Fraud Proceeds.

3. Hecker subsequently acknowledged that he had lied in his May 20, 1988 deposition about his ownership of any corporations (such as HDG), and that he had lied about transfers from his Chemical Bank account (Kokomo Ex. 29, pp. 2064–2067). The District Court ultimately determined that "Hecker made substantial misrepresentations" and "glaring omissions about his assets" during the May 20, 1988 deposition, including his failure to disclose his interest in HDG, a company which he had formed on April 15, 1988, a month prior to the deposition, and his failure to disclose transfers of over $1,500,000 to bank accounts which he controlled (Kokomo Ex. 38).

advisory fees, retainer fees, profit sharing distributions, or dividends, other than a monthly $1,200 retirement benefit that would be payable at age 65 (Kokomo Ex. 25, pp. 32–33, 59).[4]

When deposed for purposes of this action, Hecker again confirmed that between April 18 and April 21, 1988, the HDG account at Citizens and Southern Bank received deposits totaling $1,000,000 from the Chemical Bank accounts into which the Kokomo Fraud Proceeds had been deposited ($250,000 on April 18, 1988, $500,000 on April 19, 1988, and $250,000 on April 20, 1988) (June 2, 2004 Hecker Deposition Transcript, pp. 28–32; Kokomo Ex. 36, 37). Hecker also confirmed that $500,000 was transferred from the Chemical Bank accounts to an account which he opened for himself and his wife at Citizens and Southern Bank (June 2, 2004 Hecker Deposition Transcript, pp. 28–33).[5] Accordingly, aside from funds which were dissipated to his wife's company, Ingram Corp.,[6] the Chemical Bank funds, which included the Kokomo Fraud Proceeds, went to one of two places: $1,000,000 into the HDG account (which Hecker controlled), and $500,000 into the Hecker account, both at Citizens and Southern Bank, now known as NationsBank.[7] The Transaction Authorization from the Chemical Bank rec-

ords reflects the Citizens and Southern Bank account in Hecker's name to which the $500,000 was deposited as Acct. No. 0087713977 (the same account as the NationsBank account from which payments toward the purchase of the Stonebridge Property were made, as discussed below).

Hecker testified that $212,500 of the money transferred from the Chemical Bank accounts to the HDG account at Citizens and Southern Bank was paid to Heritage Display Holding Corp., which was the vehicle by which he made an investment in a company called Heritage Communications, Inc. ("Heritage") (June 2, 2004 Hecker Deposition Transcript, pp. 186–187).[8] Hecker owned 22% of the common stock of Heritage and was its President (Kokomo Ex. 28, p. 36). For the cash that Hecker put into Heritage, through HDG, Hecker received the stock in Heritage and a "consulting agreement" through which he was paid in excess of $100,000 a year. Hecker's own testimony confirms that his "consulting agreement" with Heritage was a direct product of his capital investment (made through HDG and derived from the Kokomo Fraud Proceeds):

Q. What did you put in in order to acquire your interest in Heritage?

---

4. As of 1988, Hecker would not yet have been eligible to receive those benefits, since he was not yet 65 years old (June 8, 2004 Hearing Transcript, p. 114).

5. Again, the bank records of the Chemical Bank accounts confirm that aside from a series of investment debits and credits, the funds, including the Kokomo Fraud Proceeds, remained in the Chemical Bank accounts and were not depleted until the April 1988 transfers to Citizens and Southern Bank (Kokomo Ex. 36).

6. Again, the law presumes that he dissipated his own funds before dissipating the Kokomo Fraud Proceeds.

7. Hecker acknowledged that Citizens and Southern Bank ultimately became NationsBank and that these were the same accounts (Kokomo Ex. 28, p. 131; June 8, 2004 Hearing Transcript, p. 104).

8. The remainder of the cash put into HDG appears to eventually have been depleted. At least $150,000 was transferred to Hecker's then-wife, Miriam Hecker shortly after it was moved from Chemical Bank (June 2, 2004 Hecker Deposition Transcript, p. 186). Although the disposition of the remaining funds is not clear, Hecker's schedules listed his holdings of HDG stock as having no value (Hecker Ex. 2).

A. I put in some cash.

\*     \*     \*     \*     \*     \*

Q. Upon the completion of that transaction what were your interests in Heritage?

A. I had a minority stock position, and I served as a consultant.

(June 1, 2004 Hecker Deposition Transcript, pp. 97–98).

Hecker's relationship with Heritage continued from 1988 through 1996 or 1997, during which he testified that he received compensation under his "consulting agreement" of approximately $100,000, plus bonuses of $50,000 or $60,000 per year in some years, "depending on how things went" (Kokomo Ex. 28, pp. 39–41). Although Hecker received substantial funds from Heritage and was its President, Hecker disclaimed being an employee of Heritage or that the funds he received were a salary as President (Kokomo Ex. 28, pp. 39–40). Even after Hecker "retired" from Heritage, he had a retirement agreement through which he was to continue receiving approximately $100,000 a year (Ex. 28, p. 41). Based on the evidence presented, including in particular Hecker's own description of his "consulting" agreement as being a by-product of his capital investment in Heritage, his denial of any employee relationship with Heritage, the fact that he testified to receiving a "bonus" "depending on how things went," and the fact that Hecker was to continue receiving payments from Heritage even after he "retired," the Court finds that the payments Hecker received from Heritage were more in the nature of a return on his capital contribution to Hecker (made through HDG with the Kokomo Fraud Proceeds), rather than compensation for services provided.

Hecker further confirmed that for the period from 1988 through late 1996 or early 1997, he continued to have the same relationship with Heritage, and moreover, that he could not recall any other source of revenue other than Heritage (June 2, 2004 Hecker Deposition Transcript, pp. 142, 145). Hecker specifically testified that in 1994, Heritage was his sole source of income other than the sale of a condominium (the "Willow Wood Property" discussed further below) (June 8, 2004 Hearing Transcript, p. 115). Hecker testified that his payments from Heritage were deposited "wherever I had a bank account" (June 2, 2004 Hecker Deposition Transcript, p. 189). Hecker did not identify any such account which he held after 1988 other than at Citizens and Southern Bank, later known as NationsBank (Kokomo Ex. 28, p. 131).

Hecker's available tax returns confirm that he had no substantial source of revenue other than Heritage or interest income from the NationsBank accounts. Hecker's 1993 Form 1040 Income Tax Return, Schedule C, reflects $104,196 in gross business income. The attached Form 1099–MISC Income Worksheet confirms that all of this was derived from Heritage. On the Schedule B, all but $5,843 of the total $34,776 in interest and dividend income was derived from the NationsBank accounts. Accordingly, more than 95% of Hecker's 1993 gross income ($133,129 of $138,972) came from Heritage or NationsBank interest. (Kokomo Ex. 24).

Hecker's 1994 Form 1040 Income Tax Return reflects $157,596 in gross business income on Schedule C, and the Form 1099–MISC Income Worksheet attached thereto reflects that all of that income was from Heritage. The Schedule B to the 1994 Income Tax Return reflects that at least $22,849 of the total $29,099 in interest and dividend income came from NationsBank. Thus, in 1994 all but $6,250 of Hecker's $186,405 in gross income (more

than 96%) came from Heritage or from interest on the NationsBank accounts. (Kokomo Ex. 24).

In 1995, Hecker received $183,396 in income from Heritage (there is one 1099 Form from Heritage for $174,996 in miscellaneous income, and a second form which is illegible, but the Supplemental Information form attached to Hecker's 1040 Income Tax Return reflects that all of the listed $183,396 in gross income was from Heritage). That same year, Hecker's Schedule B reflects $30,350 in interest income from the NationsBank accounts, and $12,284 in other interest and dividend income. Thus, in 1995, at least $213,746 of Hecker's $226,030 in gross income (almost 95%) was derived from Heritage or from interest on the NationsBank accounts.

Likewise, in 1996, Hecker received 1099 Forms from Heritage totaling $183,396. That is the exact same amount that he listed as gross business income in Schedule C of his 1996 Income Tax Return. (Kokomo Ex. 16, 24). The 1996 Schedule B reflects $34,560 in interest income from NationsBank, and $12,131 from other sources. Again, almost 94% of Hecker's gross income in 1996 was derived from Heritage or from NationsBank interest. (Kokomo Ex. 16, 24). The foregoing evidence is consistent with Hecker's own testimony that he had no other sources of funds after 1988 other than monies he received from Heritage, and interest accrued on the NationsBank accounts—both sources traceable to the Kokomo Fraud Proceeds.

In January 1994, Hecker and his new wife Gloria Hecker entered into a contract to buy the Stonebridge Property; they closed on the property on December 21, 1994 (Kokomo Ex. 33). The total purchase price was $408,821.22, including $360,000 as the contract sales price, plus $19,000 for "extras", $11,381.75 in settlement charges to the borrower, $14,068.17 in prorations, and $4,371.30 in closing costs paid by the purchasers (June 8, 2004 Hearing Transcript, p. 103; Kokomo Ex. 33). Of the total purchase price, $283,500 was funded through a mortgage, and the balance, $125,321.22, was through down payments ($91,000) and cash at closing ($34,321.22) (June 8, 2004 Hearing Transcript, p. 103; Kokomo Ex. 33).

On January 29, 1994, Hecker made a deposit toward the purchase of the Stonebridge Property through Check No. 1734 in the amount of $18,000, drawn from NationsBank Acct. No. 0087713977 (Kokomo Ex. 32). As noted above, this is the same bank account into which $500,000 of the Kokomo Fraud Proceeds transferred from Chemical Bank had been deposited. On November 11, 1994, Hecker paid an additional $18,000 deposit, through Check No. 2041 drawn on the same account ( Kokomo Ex. 32). Hecker also wrote a check for $9,500 on November 3, 1994 which went toward the extras on the Stonebridge Property, also drawn from the NationsBank account (June 8, 2004 Hearing Transcript, p. 113; Hecker Ex. 20). On December 21, 1994, the date of closing on the Stonebridge Property, Hecker made a further payment through another check from the NationsBank account for $24,321.22 (June 8, 2004 Hearing Transcript, p. 112; Hecker Ex. 20). Through the foregoing deposits, Hecker put a total of $69,821.22 of funds from the NationsBank account into the purchase of the Stonebridge Property.[9]

9. Hecker claimed that he and his wife put in equal amounts toward the purchase of the Stonebridge Property (Ex. 28, p. 23; June 8, 2004 Hearing Transcript, pp. 103–104). However, the foregoing transactions reflect that at least $69,821.22 of the $125,321.22 cash needed to close on the Stonebridge purchase, or 55%, came from Hecker.

Hecker claimed that some or all of the proceeds from the sale of a condominium which he had previously owned (the "Willow Wood Property") went toward the purchase price of the Stonebridge Property (June 8, 2004 Hearing Transcript, pp. 103–106). He claimed the net proceeds from the sale of the Willow Wood Property were approximately $30,000 (June 8, 2004 Hearing Transcript, p. 109). He also claimed to have received proceeds from the sale of another golf membership at around the same time (June 8, 2004 Hearing Transcript, p. 109). Upon reviewing a bank statement for his NationsBank account, Hecker claimed that two deposits on October 31, 1994 for $30,000 and $12,222.28 represented the Willow Wood Property sale proceeds, and that a deposit of $21,563.27 on November 2, 1994 represented the proceeds of the golf membership (June 8, 2004 Hearing Transcript, p. 111).

Hecker acknowledged that the first $18,000 deposit toward the Stonebridge Property he made in January 1994 could not have come from the Willow Wood Property proceeds, since the closing had not yet occurred (June 8, 2004 Hearing Transcript, p. 125). Although Hecker claimed that deposits on October 31, 1994 represented the Willow Wood Property proceeds, the Contract for Sale and Purchase for the Willow Wood Property specified that the closing was to occur on November 1, 1994 (Hecker Ex. 1). Hecker had no specific recollection of when the Willow Wood Property closing occurred, and in particular whether it was in the end of October or beginning of November 1994 (June 8, 2004 Hearing Transcript, p. 126–28):

Q. Paragraph 6 of the contract says, this transaction shall be closed and the deed and other closing papers delivered on November 1, 1994; correct?

A. Yes.

Q. Yet the deposits in your Nations Bank account, which you claim were the sale proceeds, are reflected in that account on October 31st; correct?

A. The closing could have occurred before then.

Q. But you don't recall one way or the other whether it did?

A. I said it was somewhere in that— the 30th, the 31st, or the 1st, somewhere in that area. I don't recall the exact date.

(June 8, 2004 Hearing Transcript, p. 128).

Hecker's 1994 Form 1040 Income Tax Return contains a Form 2119 entitled "Sale of Your Home" (Kokomo Ex. 24). Hecker acknowledged that the tax return was signed by him under penalty of perjury, and that the information contained in the return and attached schedules was accurate (June 8, 2004 Hearing Transcript, p. 135). The Form 2119 which Hecker attached to his 1994 tax return indicated that the Willow Wood Property was sold in *December* 1994 (Kokomo Ex. 24; June 8, 2004 Hearing Transcript, p. 136). Despite his testimony that two deposits on October 31, 1994 represented the Willow Wood Property proceeds, Hecker could offer no explanation as to why he would have received two separate checks in connection with the closing on the Willow Wood Property in October, 1994, and indeed had no recollection of having received two separate checks (June 8, 2004 Hearing Transcript, p. 129).

On cross-examination during the June 8, 2004 hearing, Hecker acknowledged that in 1996, his "consulting" income from Heritage, as evidenced by a Form 1099, was equal to $114,996, and that there is an additional Form 1099 reflecting a bonus of $60,000. In 1995, Hecker's "consulting" income from Heritage, as evidenced by a Form 1099, equaled $174,996. In 1994, Hecker's "consulting" income from Heri-

tage, as evidenced by a Form 1099, equaled $144,996 (Kokomo Ex. 17; June 8, 2004 Hearing Transcript, pp. 141–144).

The Court notes that in each year between 1994 and 1996, the amount of Hecker's income from Heritage can be expressed as $114,996 plus some additional amount representing a multiple of $10,000. When considered in conjunction with Hecker's prior testimony that he received a "consulting" fee plus a "bonus" from Heritage, it seems to be far more than a coincidence that each year's income from Heritage is stated as $___4,996. The foregoing information indicates to the Court that Hecker's "regular" consulting fee from Heritage was $114,996, and that in each of the years from 1994 to 1996 he received an additional "bonus" from Heritage: $60,000 in 1996, $60,000 in 1995; and $30,000 in 1994.

In light of all of the evidence presented, including the NationsBank account statements, the Contract for Sale and Purchase of the Willow Wood Property, the tax forms from Heritage, Hecker's prior testimony regarding his compensation arrangement with Heritage, Hecker's testimony at trial regarding the Willow Wood Property sale, including his lack of specific recollection regarding the date of the closing and inability to explain the receipt of multiple checks for the closing proceeds, and the Court's assessment of Hecker's candor and credibility, the Court finds it more likely than not that the deposit of exactly $30,000 to Hecker's NationsBank account on October 31, 1994 represented a "bonus" payment from Heritage, rather than the payment of the proceeds from the Willow Wood Property. Accordingly, the Court does not accept the argument advanced by Hecker that the two deposits on October 31, 1994 totaling $42,222.28 represent proceeds from the Willow Wood Property sale.

After considering all of the foregoing evidence, including the exhibits introduced by Kokomo and by Hecker, Hecker's prior testimony at deposition and trial, and the testimony of Douglas Bailey at trial, the Court finds that the funds used by Hecker to purchase the Stonebridge Property, drawn from his NationsBank account, were derived directly or indirectly from the Kokomo Fraud Proceeds. Specifically, after the $1,050,000 in Kokomo Fraud Proceeds were received in bank accounts at Connecticut National Bank, the funds, together with other monies, were transferred by Hecker in September 1987 (immediately after a meeting with representatives of Kokomo to discuss problems with the Kokomo transaction) to new accounts at Chemical Bank. Months later, in April 1988 (this time, shortly after being sued and immediately before a deposition at which he was to reveal his assets), those funds were moved by Hecker to newly-opened accounts at Citizens and Southern Bank (later known as Nations-Bank), specifically including $1,000,000 to the HDG account and $500,000 to Hecker's personal account. The HDG money was used for Hecker's investment in Heritage in May 1988, through which he received stock in Heritage and a "consulting agreement" which constituted his sole source of revenue for the next several years, through 1996. As a result, in 1994 when Hecker acquired the Stonebridge Property with down payments made from his NationsBank account, the only sources of funds which he could have used for those down payments, and subsequent mortgage payments, were the funds in the NationsBank account (traceable to the Kokomo Fraud Proceeds) or interest accrued thereon, and Hecker's revenues from Heritage (also traceable to the Kokomo Fraud Proceeds through the investment made via HDG).

Although Hecker's theory of exemption with respect to the Golf Equity Membership was that it was inseparable from the homestead property, at deposition he testified that he had not undertaken any review of the rules regarding the membership, including rules regarding transferability of the membership (June 4, 2004 Hecker Deposition Transcript, pp. 271–272). Although Hecker claimed at trial to have an understanding that a golf membership could not be sold apart from a home, he acknowledged in his own direct examination that he was aware of two members of the County Club who bought outside memberships without owning a home in the development (June 8, 2004 Hearing Transcript, p. 118). The only documentary evidence placed in the record relating to the golf membership consisted of the membership certificate itself, which provides no indication of any restrictions on transferability (Kokomo Ex. 34, Hecker Ex. 1).

### CONCLUSIONS OF LAW

Hecker claims his interest in the Stonebridge Property as exempt under Article X, Section 4(a) of the Florida Constitution, which provides in pertinent part:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree of execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person: (1) a homestead . . . .

■ Although this provision grants an exemption from the forced sale of a homestead, the Supreme Court of Florida has made clear that the exemption is not to be so liberally construed as to make it an instrument of fraud upon creditors. *Milton v. Milton*, 63 Fla. 533, 58 So. 718 (Fla.1912), *overruled in part by Pasco v. Harley*, 73 Fla. 819, 75 So. 30 (Fla.1917). Indeed, the Florida Supreme Court has repeatedly held that the homestead "cannot be employed as a shield and defense after fraudulently imposing on others." *See, e.g., Jones v. Carpenter*, 90 Fla. 407, 106 So. 127 (Fla.1925). As a result, under Florida law a homestead will not be exempt from the reach of creditors where fraudulently obtained funds are used to purchase, invest in or improve a homestead property. *Id.; Palm Beach Savings & Loan Ass'n F.S.A. v. Fishbein*, 619 So.2d 267 (Fla.1993); *In re Financial Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir.2003); *Babbit Electronics, Inc. v. Dynascan Corp.*, 915 F.Supp. 335 (S.D.Fla. 1995); *In re Mesa*, 232 B.R. 508 (Bankr. S.D.Fla.1999); *see Havoco of America, Ltd. v. Hill*, 790 So.2d 1018 (Fla.2001).

The continued vitality of this exception to the homestead exemption was recently recognized by the Eleventh Circuit Court of Appeals in the *Financial Federated* case. There, the bankruptcy trustee filed suit to impose an equitable lien or constructive trust against a homestead property purchased in the name of the defendant and his wife. The defendant, Ray Levy, had been engaged in a fraud involving the debtor. *Financial Federated*, 347 F.3d at 882–83. Ray Levy received proceeds of the fraud which were paid to entities which he controlled, called First R & R Trust and U.S. Benefits Services Trust. *Id.* at 883–84. The trustee presented evidence that over 90% of the funds used to purchase the homestead property were derived, "directly or indirectly," from that fraud, disbursed through First R & R Trust and U.S. Benefits Services Trust. *Id.* at 884, 892:

Kozyak can trace directly or indirectly over 90% of the funds used to purchase the El Caballo Property to the Debtor's fraud. Clearly, all but a fraction of the funds First R & R used to purchase the El Caballo Property originated with the Debtor. It is undisputed that the vast majority of the funds transferred to R & R and U.S. Benefits originated with the Debtor.

*Id.*

Based on that evidence, the Bankruptcy Court found that the property was not exempt, but rather was subject to a constructive trust or equitable lien in favor of the trustee, and the Eleventh Circuit affirmed. *Id.* In so finding, the Court cited approvingly to *In re Mart*, 106 B.R. 309, 311 (Bankr.S.D.Fla.1989), in which the court stated that if the plaintiff had proved that properties "were financed *to any significant extent* with money traceable to the funds embezzled," a resulting trust could be imposed. *Id.* at 892. The Court further found, consistent with existing Florida precedent, that the fact that the property had been purchased by a husband and wife was immaterial to whether an equitable lien could be imposed against the property, regardless of the spouse's innocence or lack of knowledge. *Id.* at 890–91, *citing Fishbein, Babbit; see also In re Crum*, 294 B.R. 402 (Bankr.M.D.Fla. 2003).

▪ The finding in *Financial Federated* that an equitable lien or constructive trust could be imposed where the fraudulently obtained funds had been traced "directly or indirectly" into the acquisition of the homestead is consistent generally with the law on constructive trusts. "Under the constructive trust doctrine, the rightful owner of misappropriated trust property may trace to the proceeds of such property and to whatever has been bought with the proceeds if it is capable of being substan-tially identified as having been acquired with the misappropriated property or funds." *Republic of Haiti v. Crown Charters, Inc.*, 667 F.Supp. 839, 843 (S.D.Fla. 1987). It is hardly fatal to a claim of constructive trust or equitable lien that the property originally subject to the claim is money, which is fungible, or that the money is transferred through various accounts or converted into different forms. *See Arduin v. McGeorge*, 595 So.2d 203, 204 (Fla. 4th DCA 1992). Indeed, in the case of *In re General Coffee Corp.*, 64 B.R. 702 (S.D.Fla.1986), the District Court rejected as "wholly without merit" an appellant's contention that a constructive trust could not be established where fraudulently obtained funds were used to purchase inventory which was "turned over" several times, and accordingly could not be specifically traced. *Id.* at 709.

▪ In conducting the constructive trust analysis, the law has created certain presumptions when dealing with commingled funds, such as bank accounts, in order to aid the beneficiaries of the trust remedy. In particular, when a person who is subject to a trust claim commingles the trust funds with funds of his own, and funds are subsequently dissipated, he is presumed to first dissipate his own funds rather than funds held in trust, such that the funds remaining in an account are presumed to be those held in trust. *See Myers v. Matusek*, 98 Fla. 1126, 125 So. 360 (Fla.1929); *In re First Fidelity Financial Services, Inc.*, 36 B.R. 508 (Bankr. S.D.Fla.1983); *see also In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1063 (3d Cir.1993) (describing the "lowest intermediate balance rule" as a legal construct that allows trust beneficiaries to assume that trust funds are the last funds withdrawn from a commingled account); *Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 942 (M.D.Ga.1986). In addition, when

funds are replenished in a commingled account that contained funds held in constructive trust, the trustee is presumed to return the beneficiary's money. *Bethlehem Steel,* 66 B.R. at 942.

■ The scenario presented herein is not a case where Kokomo seeks to impress a constructive trust against general assets of the debtor. Pursuant to the foregoing authorities, the Court finds that the evidence is sufficient to establish that the Stonebridge Property is subject to an equitable lien in favor of Kokomo, in that the evidence establishes that the Kokomo Fraud Proceeds are traceable, directly or indirectly, to the funds used by Hecker to acquire the Stonebridge Property.

The evidence, as described above, establishes that the $1,050,000 of Kokomo Fraud Proceeds which Hecker received in July of 1987 were deposited with Connecticut National Bank. A substantial portion of those funds was transferred in September 1987 to Chemical Bank (indeed, applying the presumptions described above, any expenditures made by Hecker between July and September 1987 would be presumed to be from his own funds, so that at least $1,050,000 of the $1,930,000 moved to Chemical Bank would still be deemed to be the Kokomo Fraud Proceeds). In April 1988, those funds were transferred to accounts at Citizens and Southern Bank (later known as NationsBank) in the names of HDG ($1,000,000), Hecker personally ($500,000), and Ingram Corp., a company owned by Hecker's wife ($425,000). A portion of the HDG funds were used by Hecker to make his investment in Heritage, which provided Hecker with his sole source of income from May 1993 through the end of 1996 or early 1997. As a result, the funds drawn from Hecker's NationsBank account which were used to acquire the Stonebridge Property were derived directly or indirectly from the Kokomo Fraud Proceeds—either through the money deposited to Hecker's NationsBank account, or the funds derived from the Heritage investment.

The record does not substantiate the existence of a source of funds available to Hecker in an amount sufficient to fund his purchase of the Stonebridge Property. The Court does not accept as credible Hecker's testimony that the $30,000 and $12,222.28 deposits on October 31, 1994 were the proceeds of the Willow Wood Property. Even if the $21,563.27 deposit on November 2, 1994 represented the proceeds of the sale of a country club membership, those funds could not be deemed proceeds from the sale of Hecker's Willow Wood home, and thus exempt from the claims of creditors. Such proceeds were derived from the sale of an interest in **personal** property (the Willow Wood Country club membership), ownership of which is separate from the home itself. Indeed, in order to transfer the golf membership, the seller of a home at Stonebridge would be required to pay a transfer fee of $10,000 (June 8, 2004 Hearing Transcript, p. 718). In addition, Hecker's initial down payment to acquire the Stonebridge property was made in January 1994, well before he claimed to receive $30,000 and $12,22.28 payments, ostensibly from his sale of the Willow Wood property. Also, when the presumptions described above are applied to Hecker's NationsBank account, Hecker did not have enough "clean" money available to make the subsequent payments toward the Stonebridge Property purchase. The following chart reflects the relevant transactions as evidenced in the NationsBank account statement, and the depletion of the funds claimed by Hecker to be the club membership sale proceeds:

| DATE | AMOUNT | DESCRIPTION | ACCOUNT BALANCE | "CLEAN" MONEY |
|------|--------|-------------|-----------------|---------------|
| 11/02/94 | $21,563.27 | (Sale of Golf Membership) | $47,906.30 | $21,563.27 |
| 11/02/94 | ($ 803.46) | Check 2031 | $47,102.84 | $20,759.81 |
| 11/02/94 | ($ 635.62) | Check 2034 | $46,467.22 | $20,124.19 |
| 11/02/94 | ($ 45.00) | Check 2037 | $46,422.22 | $20,079.19 |
| 11/03/94 | ($ 110.00) | Check 2036 | $46,312.22 | $19,969.19 |
| 11/03/94 | ($ 9,500.00) | (Stonebridge Extras) | $36,812.22 | $10,469.19 |
| 11/08/94 | ($ 2,000.00) | Check 2040 | $34,812.22 | $ 8,469.19 |
| 11/10/94 | ($ 400.00) | Check 2042 | $34,412.22 | $ 8,069.19 |
| 11/15/94 | ($18,000.00) | (Stonebridge Deposit) | $16,412.22 | ($ 9,930.81) |

Accordingly, while the $9,500 payment on November 3, 1994 arguably could have been made with "clean" money from the membership proceeds, by the time the second deposit of $18,000 was made on November 15, 1994, only $8,069.19 of those proceeds remained. Thus, the "clean" money available to Hecker for the Stonebridge Property purchase was no more than $17,569.19, and the remaining $52,252.03 of the total of $69,821.22 used by Hecker to acquire the Stonebridge Property unquestionably would have been derived from the Kokomo Fraud Proceeds.

Indeed, even if the Court were to accept Hecker's testimony concerning the source of funds for the purchase of the Stonebridge property, it would still be subject to an equitable lien. As indicated above, Hecker has made no effort to identify any other source of funds with respect to the $18,000 payment made in January 1994. With respect to the later payments, once the presumptions described above are applied with respect to Hecker's Nations-Bank account, the money claimed to be derived from the Willow Wood Property and the club membership sale would only "protect" the payments of $9,500 and $18,000 in November 1994, but would still leave the December 21, 1994 payment of $24,321.22 subject to Kokomo's equitable lien claim, since all of the supposedly "clean" money was depleted by November 15, 1994, as reflected in the following chart:

| DATE | AMOUNT | DESCRIPTION | BALANCE | "CLEAN" MONEY |
|------|--------|-------------|---------|---------------|
| 10/28/94 | | | $15,220.97 | |
| 10/31/94 | $12,222.28 | (Sale of Willow Wood) | $27,443.25 | $12,222.28 |
| 10/31/94 | $30,000.00 | (Willow Wood) | $57,443.25 | $42,222.28 |
| 10/31/94 | ($ 100.22) | Check 2033 | $57,343.03 | $42,122.06 |
| 11/01/94 | ($31,000.00) | (Purchase of Golf Membership) | $26,343.03 | $11,122.06 |
| 11/02/94 | $21,563.27 | (Sale of Golf Membership) | $47,906.30 | $32,695.33 |
| 11/02/94 | ($ 803.46) | Check 2031 | $47,102.84 | $31,881.87 |
| 11/02/94 | ($ 635.62) | Check 2034 | $46,467.22 | $31,246.25 |
| 11/02/94 | ($ 45.00) | Check 2037 | $46,422.22 | $31,201.25 |
| 11/03/94 | ($ 110.00) | Check 2036 | $46,312.22 | $31,091.25 |
| 11/03/94 | ($ 9,500.00) | (Stonebridge Extras) | $36,812.22 | $21,591.25 |
| 11/08/94 | ($ 2,000.00) | Check 2040 | $34,812.22 | $19,591.25 |
| 11/10/94 | ($ 400.00) | Check 2042 | $34,412.22 | $19,191.25 |

| 11/15/94 | ($18,000.00) | (Stonebridge Deposit) | | $16,412.22 | $1,191.25 |
|----------|--------------|-----------------------|---|------------|-----------|
| 11/15/94 | ($ 2,500.00) | Check 2043 | | $13,912.22 | ($ 1,308.75) |

Accordingly, at least $42,321.22 (the $18,000 paid in January 1994 plus the $24,321.22 paid in December 1994) would have been derived from the Kokomo Fraud Proceeds and subject to an equitable lien claim, thereby giving rise to the imposition of an equitable lien in favor of Kokomo in the amount of $42,321.22 against the Stonebridge Property.

Since the Stonebridge Property is subject to a claim of equitable lien or constructive trust, under applicable Florida law it is *not* exempt from the reach of creditors, and the claim of exemption under Article X, Section 4(a) of the Florida Constitution must be disallowed. Therefore, the Stonebridge Property is property of the estate subject to administration and liquidation by the trustee.

■■■ The fact that the Stonebridge Property was acquired by Hecker and his wife Gloria Hecker as husband and wife does not protect the property from the claim of equitable lien or otherwise preserve any exempt status. The Florida Supreme Court held in the *Fishbein* case, and the Eleventh Circuit confirmed in *Financial Federated,* that a spouse's lack of knowledge or involvement provides no defense to a claim of equitable lien or constructive trust where fraudulently obtained funds are used to purchase, invest in, or improve a homestead property. *See Fishbein,* 619 So.2d at 270–71; *Financial Federated,* 347 F.3d at 890–91. Gloria Hecker may be entitled to assert a claim to a portion of the proceeds prospectively to be derived from a sale of the Stonebridge Property based on the amount of her contributions to the purchase price, but the property is nonetheless an asset of the estate to be administered by the trustee.

As the foregoing indicates, this Order does not attempt to establish or determine all possible claims to the proceeds of the Stonebridge Property. It is sufficient for purposes of the present proceeding—i.e., an objection to Hecker's claimed exemption for the Stonebridge Property—to determine that the Property is not exempt as homestead under the Florida constitution insofar as it is subject to claims of equitable lien, having been acquired in part with the Kokomo Fraud Proceeds. As a result, the claimed exemption will be disallowed, and the Stonebridge Property shall be subject to administration by the Trustee, with all claims to the proceeds of any sale to be determined by further order after a sale.

■■■ With respect to the Stonebridge Country Club Membership, Hecker conceded through counsel that there is no statutory basis for claiming the asset as exempt, instead resting his claim of exemption on the assertion that the Membership is inseparable from the homestead property. Since the Stonebridge Property has been determined to be non-exempt, this argument becomes irrelevant—even if the Membership is inseparable from the property, the Stonebridge Property is not exempt, and the Membership, like the Property, may be liquidated by the Trustee. In any event, the record is devoid of any evidence to support Hecker's contention that the Membership is inseparable from the Property, and accordingly the Membership is determined to be non-exempt, the claimed exemption is disallowed, and any proceeds which can be realized from a sale of the Membership will be property of the estate.

### CONCLUSION

For the foregoing reasons, it is—

**ORDERED** as follows:

1. The Court rules in favor of Kokomo, and against Hecker, on Hecker's claimed exemption for the Stonebridge Property and the Golf Equity Membership.

2. Hecker's claimed exemption for the Stonebridge Property is disallowed.

3. Hecker's claimed exemption for the Golf Equity Membership is disallowed.

4. The Stonebridge Property and the Golf Equity Membership are property of the estate subject to administration by the trustee.