**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**George D. HUDGINS, individually and dba George D. Hudgins, L.L.C., Defendant.**

**Case No. 6:08–CV–187.**

United States District Court, E.D. Texas, Tyler Division.

June 3, 2009.

---

Kathleen M. Banar, Kim G. Bruno, James W. Deacon, U.S. Commodity Futures Trading Commission, Washington, DC, for Plaintiff.

Charles M. Meadows, Jr., David N. Reed, Kristen Michelle Cox, Meadows Collier Reed Cousins & Blau, Dallas, TX, Craig Michael Daugherty, Attorney at Law, Tyler, TX, for Defendant.

Charlene C. Koonce, Scheef & Stone, LLP, Dallas, TX, for Kelly M. Crawford, Receiver.

## MEMORANDUM OPINION AND ORDER

LEONARD DAVIS, District Judge.

Before the Court is Petition No. 14, Receiver's Petition for Order Directing Wendy Silette to Turn Over Receivership Assets and Brief in Support (Docket No. 109). Having considered the parties' written submissions and oral arguments, the Court **GRANTS** the petition.

## BACKGROUND

From at least 2005 until April 2008, George D. Hudgins ran a ponzi scheme where he fraudulently solicited members of the general public to pool together millions of dollars to trade futures contracts and options on futures contracts in violation of federal laws. *See United States v. Hudgins*, 9:08cr27, Information (Docket No. 1); *Commodity Futures Trading Comm'n v. Hudgins*, 6:08cv187 Complaint for Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief (Docket No. 1). Hudgins eventually pled guilty to his various crimes and was sentenced to 121 months. *See United States v. Hudgins*, 9:08cr27, Judgment (Docket No. 26).

The Commodity Futures Trading Commission ("CFTC") brought this action to permanently enjoin Hudgins's fraudulent activities, seek civil monetary penalties, and for other equitable relief. The Court appointed a Receiver to collect, receive and take custody, control, and pos-

session of Hudgins's assets. *See CFTC v. Hudgins,* 6:08cv187, Consent Order of Preliminary Injunction and Other Equitable Relief (Docket No. 26). The Court then entered subsequent orders governing the administration of the Receivership (Docket No. 42) and establishing a claims adjudication process (Docket No. 43). The CFTC and Hudgins resolved their dispute and jointly moved the Court to enter a proposed permanent injunction, civil monetary penalty and other equitable relief, which the Court did. *See* Docket Nos. 154, 161. The joint motion and Court's order did not terminate the Receivership, which continues to attempt to collect money that Hudgins fraudulently received from his victims and to distribute that money back to his victims. The Receiver has distributed over $24,000,000.00 to Hudgins's victims, which is approximately a third of the total approved claims. The Receiver continues to attempt to collect Hudgins's assets.

During the course of his fraud, Hudgins gave cash and tangible gifts—from money he acquired through his ponzi scheme—to friends and family. Wendy Silette is a single woman residing in Florida. Silette met Hudgins in October 2007 through an online dating service, and they began dating. On January 15, 2008, Hudgins wired $362,500 to Silette, and on March 20, 2008 Hudgins sent Silette a $6,000 check. The money was given as gift so that Silette could pay her debts and be free to travel with Hudgins. Silette used $328,034.41 of these funds to pay off the mortgage lien on her condominium. In September 2008, the condominium was appraised to be worth $260,000. The Receiver seeks an order directing Silette to turn over the condominium to the Receivership. Silette refuses to voluntarily turn over the condominium and claims the condominium is protected by Florida's homestead exemption act. There are no allegations that

Silette was in any way involved in or knew of Hudgins's fraudulent activities. Similarly, there is no dispute that the funds Hudgins gave to Silette and Silette used to pay off the mortgage were obtained through Hudgins's ponzi scheme.

## APPLICABLE LAW

■ Article X, section 4 of Florida's Constitution provides for Florida's homestead exemption:

> (a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:
>
> (1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family.

The homestead exemption "is to be liberally construed in the interest of protecting the family home." *Havoco of Am., Ltd. v. Hill,* 790 So.2d 1018, 1020 (Fla.2001). Courts have limited the exceptions to the homestead exemption to the three constitutional exceptions; thus, "a homestead is *only* subject to forced sale for (1) the payment of taxes and assessments thereon; (2) obligations contracted for the purchase, improvement or repair thereof; or (3) obligations contracted for house, field

or other labor performed on the realty." *Id.* at 1022.

Courts have applied the homestead exemption—and prevented liens on the homestead or seizure of the homestead—in several instances. In *Havoco,* after reviewing previous cases on the issue, the Florida Supreme Court answered a certified question and held that "a homestead acquired by a debtor with the specific intent to hinder, delay, or defraud creditors is not excepted from the protection of article X, section 4." *Id.* at 1030; *see also Bank Leumi Trust Co. v. Lang,* 898 F.Supp. 883 (S.D.Fla.1995) (finding homestead exempt from judgment creditor's claims even though home was purchased to defeat the creditor's claims). Courts have also held that homesteads are not subject to forfeiture even if they have been used in a crime or were purchased with criminal proceeds. *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992) (refusing to allow forfeiture where the homestead was used in the course of illegal racketeering under the state RICO Act because "[t]he Florida homestead provision clearly contains no exception for criminal activity"); *Tramel v. Stewart,* 697 So.2d 821 (Fla.1997) (refusing to allow forfeiture after a jury had found that one hundred percent of the defendants' real property was acquired, built, or improved upon with money or proceeds from illegal drug activity).

However, courts have allowed an equitable exception to the exemption when the facts of the case fall into one of the three stated exceptions to the homestead provision. *Havoco,* 790 So.2d at 1027, 1028 ("We have invoked equitable principles to reach beyond the literal language of the exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead."). Courts have equitably allowed defrauded parties to stand in the shoes of mortgagors when fraudulently obtained funds were used to invest in or purchase a homestead. *Id.* at 1024–1026 (discussing cases); *see also In re Fin. Federated Title & Trust, Inc.,* 347 F.3d 880 (11th Cir.2003) (allowing an equitable lien when the home was purchased with money from a ponzi scheme); *In re Hecker,* 316 B.R. 375 (Bankr.S.D.Fla.2004)(allowing an equitable lien when home was purchased with fraudulently obtained funds); *SEC v. Aquacell Batteries,* 2008 WL 2915064 (M.D.Fla. July 24, 2008) (allowing equitable lien when home was purchased by a relative with fraudulently obtained funds); *SEC v. Kirkland,* 2008 WL 1787234 (M.D.Fla. April 11, 2008) (allowing equitable lien for amount of fraudulently obtained funds used to purchase home plus amounts Receiver had paid for mortgage and homeowners fees).

Further, courts have not allowed an innocent spouse to claim the homestead exemption where a guilty spouse used fraudulently obtained funds to purchase or pay off a mortgage. In *In re Financial Federated,* ninety percent of the funds used to purchase the homestead were proceeds from the debtor's fraud. 347 F.3d at 892. The wife, who was innocent of the fraud, attempted to claim a homestead interest in the property. Despite her lack of knowledge or involvement in the fraud, the court denied the exemption because "a lack of knowledge on the part of the person asserting the homestead exemption does not change this analysis, as it is the fraudulent nature of the funds which is of utmost importance." *Id.* at 890 (relying on *Palm Beach Sav. & Loan Assoc. v. Fishbein,* 619 So.2d 267 (Fla.1993), in which an equitable lien was allowed over an innocent ex-spouse's homestead claim when her then-husband fraudulently obtained a mortgage on a home). The *In re Financial Federated* court also found that it did not matter whether the fraudulently obtained funds were used to purchase a home or satisfy a mortgage. *Id.* at 891 ("This distinction,

however is immaterial to the Court's ability to impose an equitable lien, as the end result is the same."). The court then imposed a constructive trust and equitable lien on the home. Although the home had depreciated substantially in value, the court imposed an equitable lien in the amount of the fraudulently obtained funds that went into the home. *Id.* at 892. Similarly, in *In re Hecker,* the court denied a homestead exemption to an innocent spouse who had equity in the home that had been purchased with ill-gotten funds. 316 B.R. at 390.

In *Fishbein,* before the formal dissolution of the marriage between Mr. and Mrs. Fishbein, Mr. Fishbein forged his wife's signature to a $1,200,000 mortgage on their existing home in Palm Beach without Mrs. Fishbein's or the bank's knowledge. *Fishbein,* 619 So.2d at 268. Mr. Fishbein then used $930,000 of the loan proceeds to pay off other existing mortgages on the home. In the divorce settlement, Mr. Fishbein was to buy his wife a $275,000 home and pay her $225,000 in return for her interest in their existing Palm Beach house. Mr. Fishbein then failed to buy Mrs. Fishbein the promised house or pay her the promised money. *Id.* at 269. The mortgage on the Palm Beach house went into default, and the bank commenced foreclosure proceedings. Mr. Fishbein was incarcerated, and Mrs. Fishbein moved back into the Palm Beach house. The judge in the divorce proceeding set aside the property settlement agreement and awarded Mrs. Fishbein the Palm Beach house. The Florida Supreme Court allowed the bank an equitable lien on the home in the amount of the mortgage proceeds that were used to pay off the prior mortgages on the home. *Id.* at 270–71 (relying on *La Mar v. Lechlider,* 135 Fla. 703, 185 So. 833 (1939) and *Sonneman v. Tuszynski,* 139 Fla. 824, 191 So. 18 (1939)). The court did this despite Mrs. Fishbein's innocence in the fraudulent acquisition of

the mortgage proceeds. *Id.* To not have done so, would have allowed Mrs. Fishbein a $930,000 windfall. *Id.* at 271.

## ANALYSIS

■ Since the money Silette obtained from Hudgins was used to pay off Silette's mortgage, the Receiver seeks to stand in the shoes of a mortgagor and obtain an equitable lien on the condominium. The Receiver argues that the central consideration in the case law is whether the funds were fraudulently obtained. Silette contends the cases turn on the debtor's culpability, and there is no accusation here that Silette is culpable for the fraud. Silette also attempts to distinguish the cases the Receiver relies on because she did not use the money to initially purchase the condo but to pay off the mortgage.

Although most of the cases do involve situations where the debtor was responsible for the fraud, the cases do not support Silette's reading. Silette used funds ultimately obtained through a ponzi scheme to pay off her mortgage. Despite her innocence in the fraud, to allow her a homestead exemption would allow her to become unjustly enriched by the ponzi scheme at the expense of Hudgins's victims. *See In re Fin. Federated,* 347 F.3d at 890, 892; *In re Hecker,* 316 B.R. at 390; *Fishbein,* 619 So.2d at 271. Allowing the Receiver to step into the shoes of her mortgagor and have an equitable lien on the condominium puts Silette in no worse position than had she not received the money at all. *See In re Fin. Federated,* 347 F.3d at 891 ("Similarly, if this Court were to impose an equitable lien on the El Caballo Property, both Roseann Levy and Ray Levy would be in the same position as they were before the fraudulent transfers, making an equitable lien appropriate."); *Babbit Elecs., Inc. v. Dynascan Corp.,* 915 F.Supp. 335, 338 (S.D.Fla.1995)("Benjamin

and Debra Borenstein will stand in no worse position by the imposition of an equitable lien than they stood before the fraudulent transfer of funds."); *Fishbein,* 619 So.2d at 270 ("Mrs. Fishbein stands in no worse position than she stood before the execution of the mortgage."). That Silette is innocent of the fraud—and another person hurt by Hudgins's acts—does not change this analysis.

Silette's argument that there is a difference between purchasing a home and paying off a mortgage on a home is also not supported by the case law. *See In re Fin. Federated,* 347 F.3d at 891 ("In the instant case the Defendants did not satisfy a mortgage with the funds; they outright purchased a home. This distinction, however, is immaterial to this Court's ability to impose an equitable lien, as the end result is the same."); *Babbit Elecs.,* 915 F.Supp. at 337 (funds used to satisfy a mortgage); *Fishbein,* 619 So.2d at 268 (fraudulently obtained funds were used to pay off other mortgages on the home); *see also In re Hecker,* 316 B.R. at 390 (innocent wife's non-fraudulently obtained funds were also invested in the home). The *In re Hecker* court did state that the innocent spouse may be entitled to assert a claim to a portion of the sale proceeds from the home based on the amount of her contributions to the purchase price. *In re Hecker,* 316 B.R. at 390. Here, Silette has not established the equity—if any—she has in the condominium, and optimistically assuming a sale price for the condominium's last appraised value of $260,000, Silette would have received more than $100,000 from Hudgins over what the Receiver will collect from the sale of her condominium. Additionally, courts have applied constructive trust principles such that decreases in value of the home are first charged against the homeowner rather than the lien or constructive trust holder. *In re Fin. Federated,* 347 F.3d at 892 (imposing an equitable lien for the full amount of the fraudu-

lently obtained funds used in the home's purchase rather than for the lesser current value of the home); *In re Hecker,* 316 B.R. at 387–88.

As the Court has authority to impose an equitable lien, it also has authority to direct the sale of the home. *Babbit Elecs.,* 915 F.Supp. at 338 (allowing foreclosure proceedings on the equitable lien); *SEC v. Kirkland,* 2008 WL 1787234 at *5 (M.D.Fla.2008). The Court does both, pending the Court's final approval of the sale.

### CONCLUSION

Accordingly, the Court **GRANTS** the Receiver's Petition No. 14 for an equitable lien on the property and **ORDERS** that the condominium be a Receivership asset. The Court further **ORDERS** the Receiver to submit a proposed order to the Court for Silette to execute a deed to the condominium and vacate the premises.