[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-16609
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-80181-CV-JCP
BKCY No. 99-34954-BKC-SH

In Re: Lewis J. Hecker,

                                                                                Debtor.

_____

LEWIS J. HECKER,

                                                                        Plaintiff-Appellant,

versus

KOKOMO SPRING COMPANY,

                                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 4, 2008)**

Before ANDERSON, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

The Appellant, Lewis J. Hecker, appeals the district court's affirmance of two orders of the bankruptcy court: (1) the denial of Hecker's claim of exemption for the Lewis J. Hecker Retirement Trust ("LJH Trust"); and (2) the denial of Hecker's claim of homestead exemption.

## I. BACKGROUND

On July 9, 1987, Kokomo Spring Company ("Kokomo") entered into an agreement to acquire stock from a company of which Hecker was the sole shareholder.[1] In connection with this sale of stock, the bankruptcy court found Hecker to have engaged in a multitude of fraudulent misrepresentations and omissions, which enabled Hecker to fraudulently acquire approximately $1.05 million in cash from Kokomo. Hecker proceeded to move these fraud proceeds through multiple banks before eventually depositing approximately $500,000 in his own personal account at NationsBank and $1,000,000 in the H.D.G. Investments Corp. ("HDG") account at NationsBank.[2] Hecker then withdrew

---

[1]At the time of the agreement, the Kokomo Spring Company was known as the Spring Acquisition Company.

[2]Hecker formed HDG in 1988, in which he owned all of its stock and served as its president.

$212,500 from the HDG account and invested it in Heritage Communications, Inc. ("Heritage"). As a result of this capital investment, Hecker received Heritage stock and a "consulting agreement."

From 1988 through 1996 or 1997, Hecker received payments from Heritage under the "consulting agreement" of approximately $100,000, plus bonuses of $50,000 or $60,000, per year. Hecker served as president of Heritage for a time, but he disclaimed being an employee of Heritage and that the payments he received from Heritage were a salary for his role as president. Hecker claimed that he received the payments for his consulting services and that the amount of the bonus was determined "depending on how things went." After Hecker "retired" from Heritage, a retirement agreement enabled him to continue receiving approximately $100,000 per year from Heritage.

On December 21, 1994, Hecker and his wife, Gloria, closed on a home ("the Stonebridge Property") for a total purchase price of $408,821.22. Of the total purchase price, $125,321.22 was funded by cash from Hecker's personal NationsBank account, and the remaining $283,500 was funded through a mortgage.

On October 8, 1999, Hecker voluntarily filed for bankruptcy under Chapter

7 of Title 11 of the United States Code. During the initial pendency of the bankruptcy litigation, Hecker had control over all estate property, including the LJH Trust which, at the time of filing, contained $540,608.65. Hecker sought to exempt two assets from the bankruptcy estate: (1) the homesteaded Stonebridge Property; and (2) the LJH Trust.

**A. The Stonebridge Property**

Upon Kokomo's objection to Hecker's claim of homestead exemption, the bankruptcy court found that the funds used to purchase the Stonebridge Property were drawn either from the NationsBank account or the revenues received from Heritage, both of which were traceable to the fraud proceeds. Hecker had directly deposited fraud proceeds into his personal NationsBank account, and the Heritage revenues constituted an automated return on Hecker's capital contribution—a contribution composed of fraud proceeds. The court rejected Hecker's argument that the Heritage revenues represented new income in the form of compensation for consulting services. Because a substantial amount of funds used to purchase Stonebridge Property were traceable to fraud proceeds, the court held that the property did not qualify for a homestead exemption and was subject to an equitable lien in Kokomo's favor. The district court affirmed.

**B. LJH Trust Exemption**

Kokomo also objected to Hecker's claim of exemption for the LJH Trust and, in March 2004, moved for a preliminary injunction on the withdrawal, transfer, encumbrance, or disposition of trust assets. On March 17, the bankruptcy court granted temporary injunctive pending further hearing and directed Hecker to provide an accounting of the balance and transactions of the trust. On April 13, the bankruptcy court entered the preliminary injunction.

Upon receiving the LJH Trust account documentation, Kokomo discovered that Hecker had withdrawn approximately $250,000 from the LJH Trust accounts since the petition for bankruptcy had been filed. Kokomo filed an emergency motion seeking a Writ of Attachment against all of Hecker's assets for the amounts withdrawn from the LJH Trust and further moved for the sanction of striking Hecker's claim of exemption for the LJH Trust. The bankruptcy court issued a Writ of Attachment against all of Hecker's property, including the LJH Trust, but did not strike Hecker's claim of exemption for the LJH Trust.

Later, at a June 7 hearing, the bankruptcy court considered Kokomo's renewed motion to strike Hecker's claim of exemption for the LJH Trust on the basis of the recent Hecker deposition, which revealed, inter alia, that Hecker had

disbursed a significant amount of LJH Trust funds well after the bankruptcy court had entered its preliminary injunction. Hecker elected not to testify on his own behalf or appear at the hearing. The court determined that Hecker had violated the March 17, 2004 order prohibiting withdrawal of funds from the Trust. The court again declined to strike Hecker's LJH Trust exemption and instead afforded Hecker the opportunity to replenish the money he had withdrawn from the LJH Trust in violation of its order. A further hearing was scheduled for June 15, 2004 to determine Hecker's compliance with the replenishment order. On June 15, the court determined that Hecker had not complied with the replenishment order and concluded that Hecker "willfully violated orders of this Court, and that he has violated his duties as a debtor, and that lesser sanctions have not, and will not, suffice." The bankruptcy court accordingly granted Kokomo's Motion to Strike Defenses and entered judgment in favor of Kokomo. Upon review, the district court again affirmed.

## II. DISCUSSION

### A. Standard of Review

"In a bankruptcy case, the district court functions as an appellate court, rendering this court the 'second court of review.'" *In re Calvert*, 907 F.2d 1069, 1071 (11th Cir. 1990) (quoting *In re Sublett,* 895 F.2d 1381, 1384 (11th Cir.

6

1990)).  "The factual findings of the bankruptcy court cannot be set aside unless they are clearly erroneous; however, conclusions of law made by either the bankruptcy court or the district court are subject to *de novo* review."  *In re Calvert*, 907 F.2d at 1071.

## B.  Homestead Exemption

Hecker argues that the bankruptcy court clearly erred in finding that the Stonebridge Property was funded with fraudulent proceeds, and therefore did not qualify for the homestead exemption.  We state from the outset that Hecker carries a heavy burden:  A finding of fact is only clearly erroneous when the reviewing court, after reviewing all of the evidence, is left with the "'definite and firm conviction that a mistake has been committed.'"  *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 698 (11th Cir. 2005) (quoting *Lykes Bros., Inc. v. United States Army Corps of Eng'rs*, 64 F.3d 630, 634 (11th Cir. 1995)).

Article X, section 4(a) of the Florida Constitution provides in pertinent part:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead . . . .

Fla. Const. art. X, § 4.

While this provision grants an exemption from the forced sale of a homestead, the exemption is inapplicable where "funds obtained through fraud or egregious conduct were used to *invest in, purchase or improve the homestead.*" *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880, 888 (11th Cir. 2003) (per curiam) (quoting *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018, 1028 (Fla. 2001)). In such cases, an equitable lien upon the property is a viable remedy for creditors. *See, e.g.*, *Palm Beach Savings & Loan Ass'n., F.S.A. v. Fishbein*, 619 So. 2d 267, 270 (Fla. 1993) (holding that creditor bank was entitled to equitable lien to the extent the funds fraudulently procured from the bank benefitted the home).

Hecker's first argument relies on the following stipulated fact: "Debtor used funds derived from 1994 income for the purchase of the property." Hecker argues that income created in 1994 could not have existed in 1987 (when the fraud occurred), and therefore the fraudulent proceeds cannot be traced to the purchase of the property. The bankruptcy court found, however, that substantially all of Hecker's income from 1987 onward was derived from fraud proceeds either in the form of Heritage investment returns or interest and dividend income from NationsBank accounts under his control. Thus, the stipulated fact that funds derived from 1994 income were used to purchase the property does not matter if it

8

is found, as here, that such income was derived from fraudulent proceeds. Hecker fails to pinpoint any clear error in the bankruptcy court's tracing of fraudulent proceeds to the Heritage disbursements or the NationsBank accounts.

Hecker also takes issue with any reliance by the bankruptcy court upon the testimony of Douglas Bailey, a shareholder and director of Kokomo, as to the tracing of funds. Hecker contends that Bailey was without personal knowledge of Hecker's funds, and that Bailey's testimony was not supported by adequate documentation. Upon review of the record, however, it is clear that the bankruptcy court's factual findings were not based solely on Mr. Bailey's testimony; rather, the findings were based in substantial part upon Hecker's own testimony and on the documentary evidence presented at trial.

In addition, Hecker believes that the bankruptcy court committed clear error by failing to account for the stipulated fact that Hecker posted two letters of credit in favor of Kokomo in 1989 for approximately one million dollars. As Kokomo points out, the stipulation clearly states that Kokomo received these funds and credited them against an outstanding judgment it had against Hecker. Hecker makes no effort to show how such funds were applied to the Stonebridge Property or how they disrupt the bankruptcy court's tracing of fraudulent funds to the property.

Hecker's final argument is that the bankruptcy court's imposition of an equitable lien upon the Stonebridge Property was improper because Hecker co-owns the property with his wife, Gloria. Hecker argues that since Gloria was not made a party to this action, and since Gloria contributed some of her own funds to purchase the property, imposition of an equitable lien upon the property is improper. Hecker cites no authority for this position, nor is it clear that Hecker raised this objection below.

Both this Court, in *In re: Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003), and the Florida Supreme Court, in *Palm Beach Savings & Loan Assoc. v. Fishbein*, 619 So.2d 267 (Fla. 1993), have explained why an equitable lien may be imposed upon property benefitted by fraudulent proceeds even where one co-owner spouse is innocent and ignorant of the fraud. The answer is straightforward: if an equitable lien is not placed on the property to the extent Hecker's fraudulently obtained funds benefitted the land, Gloria would be unjustly enriched. *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d at 890; *Fischbein*, 619 So. 2d at 270-71. Gloria would effectively receive a "windfall" by way of Hecker's decision to disburse the fraudulently obtained funds to the benefit of the family home. *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d at 890. The homestead exemption would be used as a sword, rather than a shield. *Fischbein*,

619 So. 2d at 271. For this reason, the focus of the equitable lien analysis is "the fraudulent nature of the funds," not whether the co-owner of the property had knowledge of the fraudulent activity. *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d at 890.

In light of Florida's clearly enunciated desire to impose equitable liens when the homesteads were purchased with the fruits of fraudulent activity, we see no reason why Gloria's absence as a party to this action or Gloria's contribution of her own funds to the homestead would preclude the imposition of an equitable lien. The amount of the equitable lien can be no more than the amount fraudulently obtained and used to benefit the land. *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d at 892 (holding that amount of lien must be based upon the amount of funds fraudulently obtained and used to purchase the property). In this way, Gloria stands in no worse of a position than she would absent the transfer of fraudulent funds to the homestead. *See id*. at 891 (explaining that equitable lien put the defendants in "the same position" as they were before they purchased the homestead with fraud proceeds).

## C. LJH Trust Exemption

Hecker contends that the bankruptcy court's sanction disallowing his claim of exemption for the LJH trust was improper. "Federal courts have the inherent

power to impose sanctions on parties, lawyers, or both." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006). Such power is derived from the court's need to manage its affairs and achieve the orderly and expeditious disposition of cases. *Id*. We review the court's exercise of its inherent power for abuse of discretion and, in doing so, we ask whether the court was clearly erroneous in its factual findings or applied the wrong legal standard. *Id*. In conducting this review, we are mindful that the "'key to unlocking a court's inherent power is a finding of bad faith.'" *Id*. (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001)). A party demonstrates bad faith "'by delaying or disrupting the litigation or hampering enforcement of a court order.'" *Id*. (quoting *Byrne*, 261 F.3d at 1121).

Hecker complains that the sanction of striking his claim of exception was too harsh because: (1) four-and-a-half years had passed between the time of filing Kokomo's objection to the LJH exemption and the time of the bankruptcy court's ruling and, as such, it was difficult to ascertain the exact amount to replenish within the seven-day time period allowed by the court; and (2) a lesser sanction, such as surcharge, would have been a more adequate punishment.

The record of Hecker's noncompliance in this case is clear and undisputed. Upon Kokomo's first motion to strike Hecker's claim of exemption for the LJH

12

Trust, the court declined to strike and instead issued a Writ of Attachment against all of Hecker's property. Upon Kokomo's renewed motion to strike Hecker's claim of exemption, the court found that Hecker had, in fact, violated its previous order prohibiting withdrawal of funds from the LJH Trust; however, instead of granting the motion to strike, the court ordered Hecker to replenish the funds improperly withdrawn. When Hecker failed to comply with the order to replenish, the court determined that lesser sanctions would not suffice and struck Hecker's claim of exemption.

Hecker's complaint that he lacked the time needed to ascertain the amount to replenish the LJH Trust is unpersuasive. Hecker, who improperly withdrew the funds, was in the best position to know exactly the amount to be replenished into the LJH Trust. Moreover, Hecker points to nowhere in the record where he moved for an extension of time or otherwise made known his difficulties in ascertaining the replenishment amount during the week leading up to the replenishment hearing.

Hecker's call for a lesser sanction is also unavailing. The bankruptcy court declined to strike Hecker's claim of exemption on the first and second motions by Kokomo, deciding to instead allow Hecker the opportunity to right the wrong he had committed in violating the court's order. The bankruptcy court only struck the

claim of exemption when it became clear that lesser sanctions would not suffice in light of Hecker's "willful" noncompliance.

Given Hecker's clear record of noncompliance with the bankruptcy court's orders, we find, like the district court, no abuse of discretion.

Accordingly, we affirm.

**AFFIRMED.**