Charlene Edwards Honeywell, United States District Judge
This cause comes before the Court upon Vernon M. Lee and Manon Sommers-Lee's Notice of Appeal (Doc. 1) of the Final Judgment of the Bankruptcy Court (Doc. 9-2). In the Final Judgment, the Bankruptcy Court ordered, among other things, that the Motion for Partial Summary Judgment by Burton W. Wiand, as receiver for Valhalla Investment Partners, P.L. Viking *166 Fund, LLC, Viking IRA Fund LLC, Victory Fund, LTD, Victory IRA Fund, LTD, Scoop Real Estate, L.P., and Traders Investment Club (the "Companies") (the "Receiver"), be granted; final judgment on Count I of the Complaint for the imposition of an equitable lien and Count II of the Complaint for the imposition of a constructive trust be entered in favor of the Receiver and against Defendant-Appellants Vernon M. Lee ("Lee") and Manon Sommers-Lee ("Sommers-Lee"); and an equitable lien and constructive trust in the amount of $ 336,891.39 be imposed against the property at 4018 Via Miranda, Sarasota, Florida. Doc. 9-2 at 2-3. Upon due consideration of the record, the parties' admissions, oral arguments, and otherwise being fully advised of the premises, the Court concludes that the Final Judgment of the Bankruptcy Court should be affirmed.
I. BACKGROUND
A. Arthur Nadal's Ponzi Scheme and Prior Proceedings
From December 1999 through January 2009, Arthur Nadal, who is not a party to this proceeding, purported to manage a hedge fund and investment club, but was, in fact, operating a Ponzi scheme, of which Defendants Lee, individually and as Trustee of the Vernon M. Lee Trust (the "Trust"), and Sommers-Lee (collectively, "Defendants"), are victims. Doc. 9-8 at 3-4. Nadal was indicted for and pleaded guilty to securities fraud, mail fraud, and wire fraud. Id. at 3. He was sentenced to a 168-month term of imprisonment and ordered to pay $ 174,930,311.07 in restitution. Id. The Securities and Exchange Commission ("SEC") appointed the Receiver for the Companies, who initiated clawback actions to recover what are known as false profits-the amount paid to investors above the amount they invested-from investors in the Ponzi scheme. Doc. 9-9 at 1.
Lee held accounts managed by Nadal and received false profits of $ 935,631.51. Doc. 9-8 at 5. Prior to this bankruptcy proceeding, the Receiver filed a complaint against Lee seeking to void the distributions to him and the Trust. Id. at 2. Lee had deposited the distributions between three accounts at Fidelity Investments: (1) the 4198 Account, (2) the 2750 Account, and (3) the 2887 Account. Doc. 9-5 ¶ 33; Doc. 9-6 ¶ 33. The district court in that proceeding ruled that the hedge fund and investment club were operated as Ponzi schemes when Lee received distributions, which established that Nadal made the distributions with intent to hinder, delay, or defraud his creditors, making the distributions actual fraud under Florida's Uniform Fraudulent Transfer Act, and avoidable. Doc. 9-8 at 5-6, 11; Doc. 9-9 at 40; Doc. 9-10 at 6. Judgment was entered against Lee in the amount of $ 935,631.51. Doc. 9-10 at 6. The United States Court of Appeals for the Eleventh Circuit affirmed. Doc. 9-8.
B. The Property
While the Ponzi scheme was ongoing, in February 2008, Lee purchased real property (the "Property"), which became his homestead. Doc. 9-14; Doc. 9-24. The purchase price of the property was $ 225,000, and Lee paid a total of $ 227,126.78 for the transaction. Doc. 9-12; Doc. 9-24. This was accomplished by three payments to the closing attorney from the 2887 Account: (1) a payment of $ 5,000 on February 13, 2008; (2) a payment of $ 20,000 on February 13, 2008; and (3) a payment of $ 202,126.78 on February 25, 2008.[1]
*167 Doc. 9-5 ¶¶ 36-38; Doc. 9-6 ¶¶ 36-38; Doc. 9-12 at 5, 20. Shortly prior to submitting the payment for the Property, on February 14, 2008, Lee transferred $ 100,000 of untainted funds from another account he owned-Account 2750. Doc. 9-12 at 17, 20. The warranty deed for the Property conveyed a life estate to Sommers-Lee with the remainder interest to the Trust. Doc. 9-5 ¶ 39; Doc. 9-6 ¶ 42. In 2010, Sommers-Lee and the Trust conveyed their interest in the Property to Lee and Sommers as tenants by the entireties. Doc. 9-5 ¶ 42; Doc. 9-6 ¶ 42.
Lee and Sommers-Lee contend that after they purchased the Property, they made improvements to it from untainted funds that came from annuities, social security benefits, retirement benefits, and Sommers-Lee's personal funds. Doc. 9-24. The funds were placed in Lee's 2887 account before the payments were made for renovations. Id. On October 3, 2014, the home was valued at $ 300,000. Doc. 9-24 ¶¶ 16-17.
C. Lee's Bankruptcy and The Instant Proceeding
After the judgment to recover the Nadal funds was entered against him, Lee filed for Chapter 7 bankruptcy, in which the Receiver filed a proof of claim of $ 1,391,269.41. Doc. 9-5 ¶¶ 10, 14; Doc. 9-6 ¶¶ 10, 14. Lee included the Property on his claim of exemptions as his homestead. Doc. 9-5 ¶ 13; Doc. 9-6 ¶ 13. The Receiver objected to this claim of exemption. Doc. 9-5 ¶ 13; Doc. 9-6 ¶ 13.
The Receiver filed the Complaint that relates to the instant action against Lee and Sommers-Lee, which alleged five counts, two of which are relevant to this appeal: (1) Count I requesting that the Bankruptcy Court impose an equitable lien against the Property on the basis that it was purchased from funds stolen from other investors and unjustly enriched Lee; and (2) Count II requesting that the Bankruptcy Court impose a constructive trust on the Property for the same reason. Doc. 9-5. The Receiver subsequently filed Plaintiff's Motion for Partial Summary Judgment on Counts I and II. Doc. 9-7. With respect to the equitable lien, the Receiver argued that it was an appropriate remedy for creditors to recover property purchased with funds tainted by fraud, even where property was protected by the homestead exemption found in Florida's Constitution. Id. at 8-13. As to the constructive trust, the Receiver argued that a constructive trust is an appropriate remedy for unjust enrichment, such as that from property purchased with money tainted by fraud, even where the property at issue is protected by the homestead exemption. Id. at 13-15.
Lee and Sommers-Lee opposed the motion, and argued that (1) no equitable lien or constructive trust could be placed against the Property because it was their homestead; (2) even if a lien and trust could be imposed, the law required fraudulent funds to be directly traceable to the purchase of a property before a lien or trust could be imposed, and the funds used to purchase the Property could not be directly traced to the Nadal funds; (3) even if direct traceability was not a requirement, $ 100,000 worth of the funds used to purchase the Property were untainted because they were transferred into the 2887 Account specifically to purchase the property; (4) if a lien and trust could be imposed, Lee and Sommers-Lee were entitled to a home-improvement credit because they invested untainted funds to renovate the Property. Doc. 9-13.
*168 With respect to the home-improvement credit argument, the Receiver contended that $ 21,419.20 of tainted funds remained in the 2887 Account after the purchase of the Property, which was used to pay for the improvements, so some of the renovations would likewise be tainted. Doc. 9-27 at 12. The Receiver argued that even if Lee and Sommers-Lee received a credit, it should be reduced by the amount of false profits that remained in the 2887 Account. Id.
The Bankruptcy Court imposed an equitable lien and constructive trust against the Property and in favor of the Receiver, for $ 227,126.78, plus pre-judgment interest. Doc. 9-31 at 18. The Bankruptcy Court found that the entirety of the funds used to purchase the property could be traced to tainted funds, and that Lee and Sommers-Lee were unjustly enriched by the funds traceable to the Ponzi scheme. Id. at 8. As such, the Bankruptcy Court found that an equitable lien and constructive trust were permitted under Florida law, and that the homestead exemption did not apply under the circumstances. Id. at 5-10.
Additionally, the Bankruptcy Court found that Lee and Sommers-Lee were not entitled to a credit for home improvements because they did not specify what their expenses were for, or how they added value to the Property, and their evidence did not show that the increase in value to the Property stemmed from any improvements. Id. at 16. Instead, the Bankruptcy Court found that the increase in value was "more plausibly the result of market appreciation" since the house was purchased in 2008. Id.
To determine the amount of the lien and constructive trust, the Bankruptcy Court relied on a declaration by the Receiver's forensic accountant, Maria Yip ("Yip"), that used the lowest intermediate balance method to trace the funds received from the Ponzi scheme to the account used to pay for the Property. Id. at 10-16. The Bankruptcy Court found that this tracing method was permissible, and the most equitable under the circumstances. Id. at 12-13, 15-16. Although other tracing methods would attribute some of the funds used to purchase the Property as originating from untainted sources, thereby reducing the amount of the lien and trust, the Bankruptcy Court found that because Lee dissipated nearly $ 1 million of Ponzi scheme funds that were fraudulently transferred to him, and no other funds were available to the Receiver, the lowest intermediate balance rule was the most equitable tracing method. Id. at 13. Thus, the Bankruptcy Court ruled that the equitable lien and constructive trust would be for the total price of the Property, which was $ 227,126.78. Id. at 18.
The Bankruptcy Court also ruled that the Receiver was entitled to prejudgment interest, and explained that such an award would be "consistent with the premise of the Receiver's entitlement to recover the fraudulent transfers invested in the home." Id. at 17. After supplemental briefing, the Bankruptcy Court found that the equitable lien should include interest in the amount of $ 109,764.61-the full amount that was sought by the Receiver. Doc. 9-2 at 2; Doc. 9-32 ¶ 9. This appeal followed. Doc. 9-1.
II. ANALYSIS
A. Standard of Review
The district court functions as an appellate court in reviewing decisions of the bankruptcy court. See In re Colortex Indus., Inc. , 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the bankruptcy court are reviewed de novo , and findings of fact are reviewed for clear error. In re Globe Mfg. Corp. , 567 F.3d 1291, 1296 (11th Cir. 2009). Equitable determinations *169 by the bankruptcy court are reviewed for an abuse of discretion. In re Kingsley , 518 F.3d 874, 877 (11th Cir. 2008). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Morrissette-Brown v. Mobile Infirmary Med. Ctr. , 506 F.3d 1317, 1319 (11th Cir. 2007) (citations and quotation marks omitted). In reviewing for abuse of discretion, courts recognize that there are "a 'range of possible conclusions the trial judge may reach,' and 'must affirm unless [the reviewing court] find[s] that the ... [trial] court has made a clear error of judgment, or has applied the wrong legal standard.' " Id. (quoting Amlong & Amlong, P.A. v. Denny's, Inc. , 500 F.3d 1230, 1238 (11th Cir. 2007). The burden of showing clear error falls on the party seeking to overturn a bankruptcy court's finding. See In re Caribbean K Line, Ltd. , 288 B.R. 908, 911 (S.D. Fla. 2002).
B. Whether An Equitable Lien May Be Imposed Against An Innocent Investor's Homestead.
Lee and Sommers-Lee's first argument is that no equitable lien could be imposed against the Property as a matter of law because it is protected by the homestead provision of the Florida Constitution, which states that:
There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:
(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family ....
Art. 10, § 4, Fla. Const. The homestead exemption is to be liberally construed in the interest of protecting the family home. Havoco of Am. v. Hill , 790 So. 2d 1018, 1020 (Fla. 2001) (citing Milton v. Milton , 63 Fla. 533, 58 So. 718, 719 (1912) ). Thus, under the Florida Constitution, a homestead is subject to forced sale only for (1) the payment of taxes and assessments on the property; (2) obligations contracted for the purchase, improvement, or repair of the property; or (3) obligations contracted for house, field, or other labor performed on the property. Art. 10, § 4, Fla. Const. Lee and Sommers-Lee argue that no exemption from homestead protection exists where the person claiming protection has not engaged in any fraudulent conduct, but is instead an innocent victim of the fraud of a third party with whom the innocent party has no close relation. Doc. 16 at 17-19.
The Florida Supreme Court has discussed the homestead exemption and fraud in several cases that provide guidance here. The primary case is Palm Beach Savings & Loan Association, F.S.A. v. Fishbein , 619 So. 2d 267, 268 (Fla. 1993), in which a husband acquired a house in his name, assuming the existing mortgage and executing a purchase money mortgage. The husband and his wife later executed a third mortgage on the house, which acknowledged that two prior mortgages existed. Id. Subsequently, the husband and wife began dissolution of marriage proceedings.
*170 Id. Before the dissolution of marriage was concluded, the husband borrowed $ 1,200,000 from a bank, which he secured with a mortgage. Id. In completing the paperwork, the husband forged the wife's signature on the mortgage. Id. Approximately $ 930,000 of the final mortgage was used to pay the three existing mortgages and taxes on the property. Id.
As part of the dissolution proceedings, the husband agreed to purchase a home for the wife, in exchange for which she agreed to relinquish her interest in the marital home. Id. As collateral, the husband executed a quitclaim deed for the marital home in favor of himself and his wife, and he stated that the home was free and clear of any liens except those claimed by his family. Id. The husband, however, did not buy the wife a house, and the wife moved back into the marital home. Id. Additionally, the husband defaulted on the fourth mortgage and the bank began foreclosure proceedings. Id. However, because the trial court concluded that the wife had a homestead interest in the marital home, it ruled that the mortgage could not be foreclosed. Id. at 269. The court did, however, grant the bank an equitable lien on the house to the extent that its funds were used to satisfy the preexisting mortgages and taxes. Id.
On appeal, the Fourth District Court of Appeal affirmed the ruling that the wife's homestead was not subject to foreclosure, but reversed the imposition of an equitable lien. Id. The court "reasoned that equitable liens may only be imposed against homestead real property where the beneficiary of the homestead protection is guilty of fraudulent or otherwise egregious conduct." Id. Because the wife was innocent, the court held that an equitable lien could not be imposed against her. Id.
On review before the Florida Supreme Court, the bank argued "that because its loan proceeds were used to satisfy the prior liens, it st[ood] in the shoes of the prior lienors under the doctrine of equitable subrogation." Id. Essentially, under this doctrine, the bank argued that it had "the same rights to enforce a lien against the homestead property as the prior lienholders." Id. The wife argued that because the bank's claim did "not fall within the language of the exceptions" in the homestead provision, the bank's argument must fail. Id.
In upholding the equitable lien, the Florida Supreme Court recognized that it had previously allowed equitable liens to be placed on homesteads in instances of fraud. For example, the Court had previously permitted an equitable lien against an individual's homestead where the individual embezzled funds from the company he was president of, and invested the embezzled funds into the homestead. Id. (citing Jones v. Carpenter , 90 Fla. 407, 106 So. 127, 130 (1925) ). In that case, the Court explained "that the doctrine of equitable liens followed the doctrine of equitable subrogation" which "are applied only in cases where the law fails to give relief and justice would suffer without them." Id. (quoting Jones , 106 So. at 130 ) (citing Capen v. Garrison , 193 Mo. 335, 92 S.W. 368 (1906) ). The Court in Jones rejected the argument that a lien could not be imposed against a homestead because the protection "should not be applied so as to make [the constitutional and statutory homestead exemptions] an instrument of fraud or imposition upon creditors." Id. (quoting Jones , 106 So. at 130 ). Based on a review of Jones and other cases, the Court in Fishbein concluded that equitable liens have been "imposed to prevent unjust enrichment," even where the circumstances under which the liens were imposed did not fall within the literal language of the constitutional homestead provision.
*171 Id. at 270. Moreover, the Court recognized that equitable liens had been imposed even where the party claiming homestead protection had not engaged in wrongful conduct. Id.
Thus, in Fishbein , the Court concluded that it did not matter that the wife was not involved in the fraud and, instead, the relevant question for whether an equitable lien could be imposed was whether the wife was unjustly enriched. Id. Under the facts of the case, in the absence of an equitable lien, the wife would obtain property for which prior liens had been paid, while not being liable on the loan used to pay those liens, receiving, in essence, a windfall. Id. On the other hand, by imposing an equitable lien for the amount used to pay the prior loans, the wife "st[ood] in no worse position than she stood in prior to the fraudulent mortgage." Id. Accordingly, the Court affirmed the trial court's ruling imposing an equitable lien.
The Florida Supreme Court later examined Fishbein in Havoco , 790 So. 2d at 1018. In Havoco , the Eleventh Circuit certified a question to the Florida Supreme Court of whether Florida's constitutional homestead provision "exempt[ed] a Florida homestead, where the debtor acquired the homestead using non-exempt funds with the specific intent of hindering, delaying, or defrauding creditors ...." Id. at 1019. In that case, the debtor was sued for various torts, and a judgment was entered against him for $ 15,000,000. Id. Days before the judgment became enforceable, the debtor purchased property, which he later claimed as his homestead in a subsequently filed Chapter 7 bankruptcy proceeding. Id. During the bankruptcy proceeding, the judgment creditor argued that the property was not exempt because it was purchased with nonexempt assets with the purpose of hindering, delaying, or defrauding his creditors. Id. The bankruptcy court "held that Florida law did not prohibit [the debtor] from converting nonexempt assets into a homestead, even if done with the intent to place those assets beyond the reach of his creditors," and "that Florida's fraudulent conveyance statute did not affect the debtor's right to the homestead exemption." Id. at 1020 (internal quotation omitted). After the district court affirmed the ruling, the Eleventh Circuit certified its question to the Florida Supreme Court. Id.
In answering the certified question, the Florida Supreme Court examined cases in which it had and had not applied the homestead exemption. The Court recognized that it had rejected attempts to bypass the homestead exemption in forfeiture cases. Id. at 1021. For example, the Court previously rejected an attempt by the State to obtain a homesteaded property through forfeiture following the homeowner's conviction for racketeering. Id. at 1021 (citing Butterworth v. Caggiano , 605 So. 2d 56 (Fla. 1992) ). The Court reasoned that not only was forfeiture disfavored, it was not one of the express exceptions found in the constitutional homestead provision. Id. (citing Caggiano , 605 So. 2d at 60 ). Additionally, the Court rejected the State's argument that an exception to the homestead protection existed for property obtained through criminal or immoral conduct, stating that the exceptions in the language of the homestead exemption "create[d] no personal qualifications touching the moral character of the resident nor d[id] they undertake to exclude the vicious, the criminal, or the immoral from the benefits so provided." Id. (citing Caggiano , 605 So. 2d at 60 ).
However, the Court admitted that it had "strayed from the literal language of the exemption where the equities ha[d] demanded it." Id. at 1023. Nonetheless, the Court reasoned that such cases fell within *172 one of the three stated exceptions in the constitutional provision because "[m]ost of th[e] cases involve[d] equitable liens that were imposed where proceeds from fraud or reprehensible conduct were used to invest in, purchase, or improve the homestead," or they were "situations where an equitable lien was necessary to secure to an owner the benefit of his or her interest in the property." Id. at 1024-28 (internal quotation omitted). For example, the Court explained that in Fishbein , the equitable lien allowed the "bank to stand in the shoes of the prior mortgagees who would have been entitled to proceed against the [homeowners'] homestead under the express terms of" the Constitution. Id. at 1024. Thus, the Court stated "that the use of the homestead exemption to shield assets from the claims of creditors is not conduct sufficient in and of itself to forfeit the exemption under the express terms of" the Constitution. Id. at 1028.
Based on the Florida Supreme Court's precedent, the Eleventh Circuit has upheld an equitable lien against a homesteaded property on the basis of unjust enrichment, even where the party claiming benefit from the homestead exemption committed no wrongdoing. In re Financial Federated Title & Trust, Inc. , 347 F.3d 880 (11th Cir. 2003), adopting In re Financial Federated Title & Trust Inc. , 273 B.R. 706 (Bankr. S.D. Fla. 2001). In In re Financial Federated , a company, Financial Federated Title & Trust, Inc. ("FinFed"), through a vast network of companies, ran a Ponzi scheme. Id. at 882. One individual, Raphael Levy, was the president and sole shareholder of FinFed, and also controlled two entities, First R&R Trust and U.S. Benefits Services Trusts, which received fraudulently transferred funds from FinFed. Id. at 883.
Levy and his wife purchased real property using $ 1,150,000 from First R&R Trust, and titled the property in the name of First R&R Trust. Id. at 884. At the time, approximately$ 1,309,521 of the funds in First R&R Trust's account could be directly traced back to FinFed, and $ 227,000 could be directly traced back to U.S. Benefits Services Trust. Id. Approximately 91% of the funds in U.S. Benefits Services Trust's account could be traced directly back to FinFed. Id. Days prior to an indictment being handed down in a criminal case against FinFed, First R&R Trust transferred the property to Levy and his wife by warranty deed, who obtained a mortgage for $ 700,000, using the property as collateral. Id.
FinFed filed for bankruptcy and a Trustee was appointed. Id. at 882. The Trustee filed a complaint seeking to have an equitable lien and constructive trust on the property, arguing that "most if not all of the funds used to purchase the [property] c[ould] be traced directly back to FinFed fraud ...." Id. at 884-85. Levy and his wife argued that the property was protected by Florida's constitutional homestead protection, and the wife specifically argued that "her lack of knowledge or involvement in [FinFed's and its related companies'] fraudulent activity exonerate[d] her from liability," so that an equitable lien and constructive trust could not be imposed against her interest. Id. at 890. Because Levy "invested the fraudulently obtained funds directly into homestead," the holdings of Fishbein and Havoco applied, and the homestead protection did not prevent an equitable lien from being imposed against the property. Id. Additionally, because "a lack of knowledge on the part of the person asserting the homestead exemption d[id] not change th[e] analysis," but instead "the fraudulent nature of the funds" was "of utmost importance," Levy's wife's innocence did not bar imposition of an equitable lien. Id. Instead, the Eleventh Circuit was persuaded by the lack of consideration by Levy and his wife in obtaining *173 the tainted funds to purchase the property, and their unjust enrichment by the use of the funds. Id. Indeed, the Eleventh Circuit recognized that "[u]njust enrichment can be the basis for the assertion of an equitable lien." Id.
The United States Circuit Court for the Fifth Circuit reached the same conclusion in Crawford v. Silette , 608 F.3d 275 (5th Cir. 2010). There, the defendant owned a Florida homesteaded home, but paid the mortgage off from fraudulently obtained funds given to her by an individual who ran a Ponzi scheme. Id. at 277. The defendant was dating the fraudster, but had no knowledge of the fraud and did not participate in the fraud. Commodity Futures Trading Com'n v. Hudgins , 620 F. Supp. 2d 790, 792 (E.D. Tex. 2009), aff'd, Crawford , 608 F.3d at 275. After the fraud was discovered and a receiver was appointed, the receiver demanded the gifts given to the defendant be returned, and when negotiations failed, petitioned the court for an equitable lien against the homesteaded property. Crawford , 608 F.3d at 277. The defendant argued that the property was protected by Florida's homestead exemption and that no equitable lien could be imposed because she was not complicit in the fraud. Id. The district court disagreed, and the Fifth Circuit affirmed. Id. at 279, 282.
In its decision, the Fifth Circuit explained that the Fishbein decision instructed courts evaluating whether to impose equitable liens to "focus on whether the party claiming the homestead exemption would be unjustly enriched." Id. at 279. Based on its reading of Fishbein , the Fifth Circuit concluded that under Florida law, three conditions must exist to impose an equitable lien: "(1) the owner used fraudulently obtained funds to purchase or retire a mortgage interest in the homestead; (2) the owner was unjustly enriched; and (3) the owner would be no worse off if the court imposed an equitable lien in favor of the fraud victim." Id. at 279-80. Moreover, the Court concluded that those elements were met based on the facts of the case because the funds were fraudulently obtained by the fraudster, the defendant did not earn the funds and was unjustly enriched, and the defendant would be in the same position if an equitable lien was imposed as if she had never met the fraudster. Id. at 280.
The Fifth Circuit further rejected the defendant's argument that an equitable lien was permitted in Fishbein because the transfer was between husband and wife, thereby "creating direct link between the fraud and the home and the fraudfeasor and his home." Id. The Court explained that the Fisbhbein Court directed that a party's innocence in the fraud is not the relevant inquiry, but, instead, "[t]he only relevant factor [was] whether the party [was] unjustly enriched by fraudulently obtained funds." Id. at 280-81. In the case before it, the Fifth Circuit concluded that the defendant would receive a windfall from the fraudster in the absence of an equitable lien. Id. at 281.
As Lee and Sommers-Lee do here, the defendant in Crawford argued that Fishbein was distinguishable because in Fishbein , the person who engaged in fraud directly invested money into the homestead, whereas the fraudster in Crawford gave the funds to the defendant, who independently invested the funds in her homestead. Id. at 280. Essentially, the defendant argued that "[w]ithout direct links between the fraud and the homestead ... the court cannot impose an equitable lien." Id. The Fifth Circuit rejected this argument, and concluded that "[t]he Florida Supreme Court could not be clearer: a party's innocence in the fraud is not relevant to whether the court can impose an equitable lien." Id. Instead, "[t]he only relevant factor is whether the party is unjustly *174 enriched by fraudulently obtained funds." Id. at 281.
One judge dissented from the Crawford opinion, and Lee and Sommers-Lee assert that the Court should follow the position taken by the dissent. The dissenting judge concluded that permitting an equitable lien to be placed against the property of an innocent party who had no involvement or knowledge of the fraudulent activities would be an impermissible expansion of "the Florida Constitution's famously broad homestead exemption ...." Id. at 282 (Elrod, J., dissenting). The judge noted that the defendant purchased the home as the sole owner, in her own name, and established equity in the property. Id. The fraudster had no connection to the home, never lived there, never transferred money into the home, and never established an ownership interest in the home. Id. The judge interpreted the Fishbein and other Florida decisions as allowing an equitable lien to be imposed against an innocent owner's homestead on the conditions that "(1) the fraudfeasor personally used fraudulently acquired funds to improve the homestead or pay down the debt on the homestead, and (2) the fraudfeasor possessed an ownership interest in the property at the time of the transfer or mortgage acquisition." Id. Accordingly, and "[i]n light of the Florida Supreme Court's admonition that its 'equitable lien jurisprudence should not be read too broadly' to enlarge the fraud exception," id. (quoting Havoco , 790 So. 2d at 1027 ), the dissenting judge would have held that no equitable lien could be imposed under the circumstances. Id. at 284.
Here, the Bankruptcy Court rejected Lee and Sommers-Lee's argument, followed the reasoning of the majority opinion in Crawford , and concluded that an equitable lien was appropriate because "[t]he focus is not on [Lee and Sommers-Lee's] culpability, but on the necessity of preventing or mitigating their unjust enrichment by permitting fraudulent transfers to be sheltered in their homestead." Doc. 9-31 at 8-9. The legal conclusion of whether an equitable lien may be imposed against an innocent homeowner is reviewed de novo. In re Globe Mfg. Corp. , 567 F.3d at 1296.
This Court agrees that the Fishbein and Havoco decisions instruct that whether an equitable lien may be imposed depends on the fraudulent nature of the funds and the homeowner's unjust enrichment. The focus in these cases did not revolve around the fraudster's connection to the home, but instead the unjust enrichment enjoyed by the homeowner. Lee and Sommers-Lee's argument that the Florida Supreme Court has allowed an equitable lien to be imposed only under the condition that the person who committed the fraud (1) personally used the fraudulently acquired funds to purchase, make improvements on, or pay down on the homestead property; and (2) possessed an ownership interest in the homestead property at the time of the application of the fraudulently acquired funds is not supported by the decisions. Nothing in the decisions suggest that the fraudster's connection to the property was a prerequisite or critical component of the analysis, which instead focused on unjust enrichment. Thus, the Bankruptcy Court did not err in imposing an equitable lien on the basis that the funds used to purchase the Property were the product of fraud, and Lee and Sommers-Lee were unjustly enriched by the funds.
C. Whether A Constructive Trust May Be Imposed In The Absence Of A Confidential Relationship Between The Parties Or Fraudulent Conduct By The Defendants
The Bankruptcy Court found that Lee and Sommers-Lee were unjustly enriched *175 by the receipt of the fraudulent transfers that they invested in their home, and imposed a constructive trust against the property based on the conclusion that a constructive trust is an appropriate remedy for unjust enrichment, even in the absence of a confidential or fiduciary relationship between the person benefitting from the trust, and the one against whom it is imposed. Doc. 9-31 at 9-10. Lee and Sommers-Lee argue on appeal that the Bankruptcy Court erred on the law because a constructive trust may be imposed only where the party against whom it is imposed (1) engaged in fraud, or (2) abused a confidential relationship. Doc. 16 at 27. Because Lee and Sommers-Lee did not engage in any fraud and had no confidential relationship with the Receiver, Companies, or other investors, they contend that a constructive trust may not be imposed.[2] Id.
"A constructive trust is a remedy which equity applies in order to do justice." Wadlington v. Edwards , 92 So. 2d 629, 631 (Fla. 1957). "The trust is 'constructed' by equity to prevent an unjust enrichment of one person at the expense of another as the result of fraud, undue influence, abuse of confidence or mistake in the transaction that originates the problem." Id. The Florida Supreme Court has previously stated that "[t]he rule is well established in Florida and elsewhere to the effect that when a person acquires title to property through influence of a confidential relationship or otherwise obtains advantage in which he should not in good conscience be permitted to retain, a court of equity will prevent the abuse of the confidence and grant relief on the broad principle that one should not be permitted to be unjustly enriched under such circumstances at the expense of another." Williams v. Grogan , 100 So. 2d 407, 410 (Fla. 1958).
Florida courts consistently list the following as elements of a constructive trust, to be proven by clear and convincing evidence: (1) a promise, express or implied, (2) transfer of the property and reliance thereon; (3) a confidential relationship, and (4) unjust enrichment. See, e.g. Castetter v. Henderson , 113 So. 3d 153, 155 (Fla. 5th DCA 2013) ; Bank of Am. v. Bank of Salem , 48 So. 3d 155 (Fla. 1st DCA 2010). Thus, constructive trusts are ordinarily imposed only in cases involving a confidential relationship between the parties. With respect to the res, courts state that "a constructive trust may be imposed only where the trust res is 'specific and identifiable property,' or can be clearly traced in assets of the defendant.' " Frieri v. Capital Inv. Servs., Inc. , 194 So. 3d 451, 455 (Fla. 3d DCA 2016) (quoting Bank of Salem , 48 So. 3d at 158 ).
Despite the above, the Florida Supreme Court has extended use of a constructive trust beyond instances involving fraud or abuse of a confidential relationship. In In re Estate of Tolin , 622 So. 2d 988, 990-91 (Fla. 1993), the Court stated that although the remedy of a constructive trust "is usually limited to circumstances in which fraud or breach of confidence has occurred, it is proper in cases in which one party has benefitted by the mistake of another at the expense of a third party." In that case, the testator drafted a will, leaving his residuary property to an individual. Id. at 989. He subsequently executed a codicil that changed to whom the residue of his estate would be left. Id. The testator later had a change of heart, and *176 again wished to leave his residual estate to the initial individual beneficiary. Id. Incorrectly believing that he had the original codicil and that he could revoke the codicil by tearing up the original with the intent to revoke it, he tore up the codicil. Id. He, however, did not have the original, which was in the possession of his attorney. Id.
After the testator died, his attorney petitioned the probate court and filed a motion to determine the validity of the codicil. Id. Although the Florida Supreme Court determined that the codicil was not effectively revoked, it did consider whether a constructive trust in favor of the intended beneficiary should be imposed under the circumstances. Id. at 990-91. Because the testator's intent was undisputed, but not given effect because of a mistake of fact, the Court concluded that the equitable remedy of a constructive trust was an appropriate remedy. Id. at 991.
In American National Bank of Jacksonville v. Federal Deposit Insurance Corp. , 710 F.2d 1528, 1541 (11th Cir. 1983), the Eleventh Circuit cited with approval the Florida Supreme Court's statement that "[a] constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, through acquired originally without fraud, it is against equity that it should be retained by him who holds it .... " Id. (quoting Quinn v. Phipps , 93 Fla. 805, 113 So. 419, 422 (1927) (emphasis in original) ). Although American National is not entirely on point because the party against whom the constructive trust was imposed was not entirely innocent, whereas Lee and Sommers-Lee are victims, the case demonstrates that a constructive trust may be imposed where it is not equitable for the person holding the funds to retain such funds. Similarly, in In re Financial Federated , 347 F.3d at 891, the Eleventh Circuit affirmed imposition of a constructive trust on a homestead purchased with fraudulently obtained funds where one of the owners of the property was innocent of any fraud. There, the Court stated that "[t]he doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction." Id.
Accordingly, the Bankruptcy Court here correctly ruled that a constructive trust may be imposed in the absence of a confidential or fiduciary relationship, and that it is an appropriate remedy for unjust enrichment. Doc. 9-31 at 9-10. Because Lee and Sommers-Lee were unjustly enriched by the receipt of funds fraudulently obtained from other investors and transferred to them, the Bankruptcy Court did not err in imposing a constructive trust against the Property. Defendants have benefitted from the fraudulent conduct of Nadal at the expense of third parties, and their investment in the Property was made from funds that did not rightfully belong to them. Therefore, a constructive trust against the Property is an appropriate remedy.
D. Whether The Funds Must Be Directly Traceable to Nadal Scheme and Whether the Lowest Intermediate Balance Rule May Be Applied
The Bankruptcy Court determined that the entire Property transaction was made using tainted funds based on Yip's analysis that used the lowest intermediate balance rule. Doc. 9-31 at 10-15. The Bankruptcy Court provided a helpful and concise summary of the tracing:
1. After June 30, 2006, substantially all the funds deposited into a third Fidelity *177 account, Account 4198, came from nine Victory Fund[3] distributions; subsequently, Debtor made two transfers from this account, totaling $ 272,728.61, to his Account 2887.
2. In September of 2007, Account 2750 had a balance of $ 153,303.14 (assumed by Ms. Yip to be untainted funds); thereafter, four distributions of Ponzi scheme proceeds, totaling $ 100,000, were received from the Victory Fund and deposited into Account 2750; on February 14, 2008, $ 100,000 was transferred to Account 2887; the remaining balance in Account 2750 thereafter was $ 156,710.12.
3. On October 31, 2007, Account 2887 had a balance of only $ 5,582; by December 31, 2007, the balance grew to $ 282,966.71, including the transfers of $ 272,728.61 from Account 4198.
4. After a series of payments to third parties, which Ms. Yip treated as deductions from untainted funds, there was $ 148,545.98 in Account 2887 on February 11, 2008, which Ms. Yip designated as tainted funds from the Ponzi scheme because it was less than the $ 272,728.61 that had been transferred from Account 4198, which itself held mostly Ponzi scheme deposits; on February 14, 2008, $ 100,000 was transferred from Account 2750 into Account 2887; then, transfers totaling $ 227,126.78 were made from Account 2887 to an attorney's account for the purchase of the home; at all relevant points in time, the total amount in Account 2887 exceeded the amount of the transfers to the attorney's account.
Doc. 9-31 at 13-14. Lee and Sommers-Lee do not challenge this factual analysis, and instead argue that no tracing method may be used or, alternatively, that this tracing method should not have been used because it was not equitable.
Specifically, Lee and Sommers-Lee argue that the law requires that the funds used to purchase the Property must be directly traceable to the fraudulent funds received from the Nadal Ponzi scheme, and that the funds here are not directly traceable because an accounting method is required to trace funds between accounts. Doc. 16 at 29-38. The Receiver disagrees, and argues that no direct tracing requirement is imposed by the law and the lowest intermediate balance rule was properly applied. Doc. 19 at 36-43.
1. Direct Tracing
The Eleventh Circuit has upheld use of tracing funds that were the subject of fraud in imposing an equitable lien against a homestead purchased with or improved by such funds. In In re Hecker , 264 F. App'x 786, 787 (11th Cir. 2008), the debtor made "a multitude of fraudulent misrepresentations and omissions," that allowed him to acquire a significant amount of cash from a company in connection with a stock sale in 1987. The proceeds were moved through multiple banks before, ultimately, a portion of them-$ 500,000-were deposited into the debtor's personal account, and the balance was deposited in an account owned by a corporation owned by the debtor, H.D.G. Investment Corp. ("HDG"). Id. The funds deposited to HDG's account were later invested into another company, which made payments to the debtor. Id. In 1994, the debtor and his wife closed on a home and the down payment of $ 125,321.22 was made from the debtor's personal account. Id. at 788.
The debtor in In re Hecker later filed for bankruptcy, and the company to which the debtor sold the stock objected to the debtor's claim of a homestead exemption.
*178 Id. The debtor argued that the funds used to purchase the property "represented new income in the form of compensation for consulting services." Id. The bankruptcy court found that the funds used to purchase the property were traceable to the personal account as well as the HDG account, both of which were traceable to the fraud proceeds. Id. The bankruptcy court reasoned that the debtor "had directly deposited fraud proceeds into his personal ... account, and the ... revenues [of the investment made from the HDG account] constituted an automated return on [the debtor's] capital contribution-a contribution composed of fraud proceeds." Id. The district court affirmed the bankruptcy court, and the Eleventh Circuit affirmed as well, concluding that the debtor failed "to pinpoint any clear error in the bankruptcy court's tracing of fraudulent proceeds to" the accounts. Id. at 788, 790. Thus, an equitable lien equal to the amount of fraudulently obtained funds used was permitted. Id. at 791. The Eleventh Circuit's decision in In re Hecker indicates that an equitable lien may be imposed against a homestead even where the fraud-tainted funds are not immediately and directly used to purchase the homestead. Instead, where the funds can be traced to the fraud, an equitable lien is permissible.
Indeed, in the underlying decision of the bankruptcy court in In re Hecker , 316 B.R. 375, 387 (Bankr. S.D. Fla. 2004), the bankruptcy court explained that "[i]t is hardly fatal to a claim of constructive trust or equitable lien that the property originally subject to the claim is money, which is fungible, or that the money is transferred through various accounts or converted into different forms." Id. (citing Arduin v. McGeorge , 595 So. 2d 203, 204 (Fla. 4th DCA 1992) ).
Similar logic was applied by the Eleventh Circuit in In re International Administrative Services, Inc. , 408 F.3d 689, 705 (11th Cir. 2005). There, a company was under investigation for securities fraud, as well as failure to pay state taxes, and its attorney transferred assets to various foreign and domestic entities owned by the attorney, "then recycled the assets through a dangled and complex web of multi-step international transactions." Id. at 695-96. The company later filed for Chapter 11 bankruptcy. Id. at 696. The Trustee sought to avoid various transfers under the Bankruptcy Code. Id. at 697. The defendants argued that the Trustee was required to "avoid the transfers to the initial transferees before he ha[d] a cause of action against the subsequent transferees," and that recovery was improper because "the Trustee failed to first sue the initial transferees ...." Id. at 703-04. In rejecting this argument, the Eleventh Circuit explained that "[i]f the initial transaction must be avoided in the first instance, then any streetwise transferee would simply re-transfer the money or asset in order to escape liability." Id. at 704.
Although this case does not fall under the bankruptcy provision at issue in In re International Administrative Services , its rationale is applicable. Lee and Sommers-Lee essentially argue that because money is fungible, it cannot be directly traced and no tracing method should be permitted. Under this logic, it would be impossible to directly trace money to any subsequent transfer after it has been deposited into an account where the account has other funds or transfers of funds in or out of the account. Fraudulently transferred money would be impossible to recover as long as transfers were made to or from that account. The Eleventh Circuit has not imposed such a burden in imposing equitable liens.
*179 Nonetheless, Lee and Sommers-Lee rely on various cases stating that an equitable lien may be imposed where the misappropriated funds are directly traceable to the homestead. For example, in In re Financial Federated , 347 F.3d at 888, the Eleventh Circuit stated that "the Havoco decision has upheld the equitable lien cases where the funds obtained through fraud or egregious conduct can be directly traced to the investment, purchase or improvement of the homestead." (Emphasis added). Similarly, in In re Thiel , 275 B.R. 633, 638 (Bankr. M.D. Fla. 2001), the United States Bankruptcy Court for the Middle District of Florida stated that "the party seeking the equitable lien must trace the proceeds derived from the fraudulent or egregious conduct directly to the purchase, pay off, or improvement of the homestead." In so stating, the court cited to Havoco , 790 So. 2d at 1028. However, a review of the Havoco decision reveals that the term "direct" is not used as a limitation for tracing funds acquired through fraud. Instead, the decision states that the Court has "invoked equitable principles to reach beyond the literal language of the [homestead] exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." 790 So. 2d at 1028. Thus, the "direct" language in In re Financial Federated Title and Trust and In re Thiel , is not a requirement imposed by Havoco .
Indeed, the United States District Court for the Middle District of Florida has previously rejected a direct tracing requirement of funds in imposing an equitable lien against a homestead obtained through fraudulently acquired funds. In In re Mazon , 387 B.R. 641, 645-46 (M.D. Fla. 2008), the debtors argued that funds could not be adequately traced to fraudulent activity to impose an equitable lien against their homestead. On appellate review, the Middle District stated that "[w]here tracing funds is involved, a dollar-for-dollar accounting is not required," and "[m]ere comingling of funds does not defeat tracing." Id. at 646. Thus, Lee and Sommers-Lee's argument that the fraudulently obtained funds must be directly traced to the Property is not persuasive, and the Bankruptcy Court did not err in employing tracing to determine the amount of the equitable lien.
The same applies to the constructive trust. Lee and Sommers-Lee contend that strict tracing is required for imposition of a constructive trust. Doc. 16 at 28-29. Indeed, in order for a constructive trust to be imposed, there must be a specific and identifiable res. United States v. Rothstein , No. 09-6033-CR, 2010 WL 3396765, at *2 (S.D. Fla. Aug. 26, 2010). This, however, is not a bar to use of tracing methods. Id. In In re Financial Federated , the Eleventh Circuit permitted a constructive trust to be imposed where the funds used to purchase the homestead were "directly or indirectly" traceable to the debtor's fraud. 347 F.3d at 892. Accordingly, the Bankruptcy Court properly employed a tracing method in imposing the constructive trust.
2. Lowest Intermediate Balance Rule
Yip applied the lowest intermediate balance rule to determine that the Property was purchased with tainted funds, and this analysis was accepted by the Bankruptcy Court. Doc. 9-12 ¶ 33; Doc. 9-31 at 11. Lee and Sommers-Lee argue that the version of the lowest intermediate balance rule used by Yip was modified because it treated transfers to third parties as untainted until untainted funds were exhausted, but did not do so for transfers between Lee's own accounts. Doc. 16 at 32. The Bankruptcy Court addressed this argument, and stated that "Defendants misconstrue the applicable *180 principles employed by courts to preserve a trust res. " Doc. 9-31 at 14. The Bankruptcy Court determined that "[w]hen funds are withdrawn from an account holding commingled funds, ordinarily the presumption is that non-trust funds are withdrawn first, thereby preserving as much of the beneficiary's trust funds for as long as possible," but concluded that the presumption was "at the option of the trust beneficiary." Id. The Bankruptcy Court further concluded that a fundamental difference existed between transfers to third parties and transfers between Lee's own accounts because there was an interest in considering third-party transfers to be untainted funds to preserve the trust. Id. at 15.
Additionally, the Bankruptcy Court determined that the lowest intermediate balance rule was the most equitable tracing method under the facts, despite Lee and Sommers-Lee's arguments that another method would allow them to retain a portion of the purchase price for the Property. Specifically, the Bankruptcy Court found that Lee "dissipated nearly $ 1 million of Ponzi scheme funds that were fraudulently transferred to him" and, other than the Property, there is nothing else the Receiver could recover on behalf of the victims. Doc. 9-31 at 13. Based on this, the Court found that the use of other accounting methods "would give the Defendants a windfall." Id.
On appeal, Lee and Sommers-Lee do no more than disagree with the Bankruptcy Court's finding that the lowest intermediate balance rule is the most equitable method under the circumstances. Doc. 16 at 34-38. Lee and Sommers-Lee have not cited to any authority showing that the lowest intermediate balance rule could not be used, relying instead on their equitable argument. Equitable determinations by the bankruptcy court are reviewed under an abuse of discretion standard. In re Kingsley , 518 F.3d at 877. Given the findings that Lee received profits of nearly $ 1 million, a judgment was entered against him that has not been paid, and Lee gambled away his assets, it cannot be said that the Bankruptcy Court's use of a tracing method that increases the recovery for the benefit of defrauded investors was an abuse of discretion.
Accordingly, the Bankruptcy Court did not err in imposing an equitable lien and constructive trust in the amount of $ 227,126.78, which represents the amount of fraudulent funds traceable to the homestead using the lowest intermediate balance rule. Doc. 9-12 ¶ 41; Doc. 9-31 at 13-18.
E. Home Improvement Credit
The Bankruptcy Court did not give any credit to Lee and Sommers-Lee for any alleged home improvement expenses. Doc. 9-31 at 16. The Bankruptcy Court explained that Lee and Sommers-Lee did not specify how the expenses added value to the property, and provided only an outdated appraisal of the property that did not attribute any increase in value from the purchase price to home improvements. Id. On appeal, Lee and Sommers-Lee again contend that they should receive credit for untainted monies invested in the home. Doc. 16 at 39.
However, Lee and Sommers-Lee do not point to any legal or factual error by the Bankruptcy Court. They do not address the Bankruptcy Court's factual conclusions at all. Instead, they simply reiterate the argument made below. Doc. 16 at 38-40. Thus, Lee and Sommers-Lee have failed to meet their heavy burden of demonstrating clear error in the Bankruptcy Court's factual findings. In re Mazon , 387 B.R. at 646 (noting that appellants have the burden of demonstrating clear error with respect to *181 a bankruptcy court's factual findings, and that this burden is a heavy one).
F. Whether The Bankruptcy Court Erred By Awarding Prejudgment Interest
Following the order granting the Receiver's counts to impose an equitable lien and constructive trust, the Bankruptcy Court ordered supplemental briefing regarding the amount of prejudgment interest that should be imposed. Doc. 9-31 at 19. The Receiver sought an award of prejudgment interest from the date of the fraudulent transfers, or an amount of $ 109,764.61. Doc. 9-32, 9-33. Lee and Sommers-Lee contended that prejudgment interest should not be awarded with respect to the equitable lien and constructive trust, and that those amounts should be limited to the amount of false profits used to purchase the home. Doc. 9-36. The Bankruptcy Court awarded the full amount requested by the Receiver-$ 109,764.61-reasoning that Lee and Sommers-Lee "have had the benefit of that money sitting in that house for the last [nine] years." Doc. 11 at 9. The Bankruptcy Court found that it was "appropriate to calculate and encumber the house with an interest rate on the money that [Lee and Sommers-Lee] were not entitled to ...." Id.
Lee and Sommers-Lee contend on appeal that the equitable lien and constructive trust may not exceed the amount of the funds used to purchase the Property and, therefore, prejudgment interest cannot be added to that amount. Doc. 16 at 40-42. In making this argument, Lee and Sommers-Lee cite to cases imposing an equitable lien against a homesteaded property stating that the innocent parties should be left in no worse of a position absent the transfer of fraudulent funds to the homestead. Id. at 41. For example, in In re Hecker , the Eleventh Circuit stated that "[t]he amount of the equitable lien can be no more than the amount fraudulently obtained and used to benefit that land." 264 F. App'x at 791 (citing In re Fin'l Federated , 347 F.3d at 892 ). By limiting the equitable lien to that amount, the Eleventh Circuit concluded that the innocent party stood "in no worse of a position than she would absent the transfer of fraudulent funds to the homestead." Id. ; see also Fishbein , 619 So. 2d at 270-71 (affirming imposition of an equitable lien in the amount of the prior mortgages that were paid off because the innocent party would be in no worse of a position). However, in In re Hecker , the Eleventh Circuit did not consider the issue of prejudgment interest.
Neither party cited to any case law on whether prejudgment interest may be included in the amount of an equitable lien imposed against a homestead, nor has the Court located any. Although cases have found that prejudgment interest may be awarded for claims involving equitable liens, see Zacco Contractors, Inc. v. Irving Trust Co. , 488 So. 2d 616, 617 (Fla. 3d DCA 1986), it is unclear whether the award increased the amount of the equitable lien, or was simply granted. Similarly, although a Florida case added prejudgment interest to the amount of an equitable lien, the decision did not discuss the rationale and did not involve a claimed homestead exemption. Radison Props., Inc. v. Flamingo Groves, Inc. , 767 So. 2d 587, 591-92 (Fla. 4th DCA 2000) (stating that the party seeking the lien was "entitled to an equitable lien on the property in the amount [paid towards delinquent taxes] plus interest."). Lee and Sommers-Lee are correct that the amount of equitable liens awarded in the cases cited by them equaled the amount of funds tainted by fraud.
*182 However, under Florida law, prejudgment interest is "merely another element of pecuniary damages." Argonaut Ins. Co. v. May Plumbing Co. , 474 So. 2d 212, 214 (Fla. 1985). "[W]hen a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." Id. at 215. Nonetheless, "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." Flack v. Graham , 461 So. 2d 82, 84 (Fla. 1984) (quoting Bd. of Commis. Of Jackson Cnty. v. United States , 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939) ).
The Eleventh Circuit has stated that three factors should guide a court's discretion in deciding whether to award prejudgment interest on equitable grounds: "(1) in matters concerning government entities, whether it would be equitable to put the burden of paying interest on the public in choosing between innocent victims; (2) whether it is equitable to allow an award of prejudgment interest when the delay between injury and judgment is the fault of the prevailing party; [and] (3) whether it is equitable to award prejudgment interest to a party who could have, but failed to, mitigate its damages." Wiand v. Lee , 753 F.3d 1194, 1204 (11th Cir. 2014). After reviewing these three factors, a court may decide not to award prejudgment interest, or to reduce the amount of the interest. Id. The trial court's decision to refuse or reduce prejudgment interest in weighing the equities is reviewed for abuse of discretion. Id.
In the clawback action between the Lees and the Receiver, the bankruptcy and district courts declined to award prejudgment interest. Wiand , 753 F.3d at 1204-05. The magistrate judge reasoned that "allowing recovery of prejudgment interest against the Lee Defendants would be inequitable because they invested in the Hedge Funds assuming their legitimacy, paying prejudgment interest would result in an award greater than the amount of their profits, and because 'the Lee Defendants have suffered enough.' " Id. at 1205. The Eleventh Circuit found that this rationale was an abuse of discretion "because it fail[ed] to identify and apply the equitable factors," and "[t]he general observation that the Lee Defendants 'have suffered enough' d[id] not explain why the receiver [wa]s not entitled to be made whole under Florida law ...." Id. The Eleventh Circuit remanded "with instructions for the court to apply the factors ... to determine whether equitable considerations justify denying or reducing a prejudgment interest award in light of Florida's general rule that prejudgment interest is an element of pecuniary damages." Id. at 1206.
In light of Florida cases recognizing that prejudgment interest may be imposed on equitable liens as part of damages, the Bankruptcy Court did not err in imposing interest. Although there is no clear law applying the rule to the facts of this case, the Eleventh Circuit and Florida law are clear that a prevailing party is entitled to prejudgment interest. The Bankruptcy Court found that under the facts of this case, and particularly the lengthy amount of time during which Lee and Sommers-Lee benefitted from possession of other investors' funds, prejudgment interest was appropriate to make the Receiver whole. Doc. 9-31 at 17. Accordingly, it necessarily concluded that the equities did not justify reduction or elimination of prejudgment interest. Lee and Sommers-Lee have not shown that the Bankruptcy Court abused its discretion in weighing the equities.
*183 III. Conclusion
Lee and Sommers-Lee have not shown that the Bankruptcy Court made any error of law, made factual findings that are clearly erroneous, or abused its discretion in making equitable determinations. The Bankruptcy Court correctly applied the law to the facts.
Accordingly, it is hereby ORDERED AND ADJUDGED:
1. The Final Judgment of the Bankruptcy Court (Doc 9-2) entered on July 20, 2017, which granted the Receiver's Motion for Partial Summary Judgment, imposed an equitable lien and constructive trust against the property whose principal address is 4018 Via Maranda, Sarasota, Florida, in the amount of $ 336,891.39, an amount inclusive of prejudgment interest, is AFFIRMED .
2. The Clerk is directed to close this case.
DONE AND ORDERED in Tampa, Florida on July 3, 2018.

Although the Complaint and Answer indicate the first two checks were written on February 6 and 7, respectively, other evidence shows that the payments were not actually made until February 13. Doc. 9-5 ¶¶ 36-38; Doc. 9-6 ¶¶ 36-38; Doc. 9-12 at 5, 20.

Lee and Sommers-Lee also argue that a constructive trust may not be imposed because the funds transferred from Nadal cannot be directly traced back to the Property, and no identifiable res exists. That argument will be discussed in the following section.

The Victory Fund was run by Nadal.